**FLORIDA POWER
CORPORATION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS
COMMISSION, Respondent.**

Nos. 84–3683, 84–3904.

United States Court of Appeals,
Eleventh Circuit.

Oct. 8, 1985.

Rehearing and Rehearing En Banc
Denied Nov. 12, 1985.

Alan J. Topol, Michael S. Bernstein, Alyson C. Flournoy, Washington, D.C., for petitioner.

Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., Margaret G. Halpern, Washington, D.C., for respondent.

Paul Glist, Washington, D.C., for intervenors Acton Corp. and Group W Cable, Inc.

J. Christopher Redding, Charles H. Helein, Washington, D.C., for intervenor Cox Cablevision Corp.

Shirley S. Fujimoto, Washington, D.C., for intervenor the Tampa Elec. Co.

Brenda L. Fox, Washington, D.C., for intervenor the Nat. Cable Television Ass'n, Inc. (NCTA).

Peyton G. Bowman, III, Daniel J. Wright, Washington, D.C., for intervenors Miss. Power & Light Co. (MP&L), Ariz. Public Service Co. (APS) and Ala. Power Co. (APC).

Gardner Gillespie, Washington, D.C., for intervenor F.C.C.

Before RONEY and FAY, Circuit Judges, and DUMBAULD *, District Judge.

PER CURIAM:

This case involves an appeal by Florida Power Corporation (hereinafter "Florida Power") from an Order issued by the Federal Communications Commission (hereinafter "FCC" or "Commission") authorizing certain cable television companies to maintain cable equipment on Florida Power's utility poles at a rate significantly less than that specified in prior contracts between the parties. This Order was issued pursuant to the Pole Attachments Act, 47 U.S.C. § 224 (West Supp.1985).

We conclude that the Order, which mandates a rental rate of less than one-third the agreed upon rates and which in reality precludes Florida Power from excluding the cable companies under any circumstances, amounts to a taking of private property for which just compensation is due under the Takings Clause of the Fifth Amendment. While the FCC's Order did impose a rate which was arguably "just" under the rule prescribed by Congress in the Act, that determination is insufficient for purposes of the Fifth Amendment. Once there has been a taking, the determination of just compensation is a judicial, and not an administrative function. Because the Act does not properly allow for a judicial determination of just compensation, it is in our opinion, unconstitutional. Accordingly, the FCC's Order is hereby vacated.

GENERAL BACKGROUND

Since the advent of cable television in the 1950's, it has become a common practice for the telephone and electric utilities to permit cable television operators to set up their distribution systems by attaching cables and equipment to preexisting pole systems owned and maintained by the utilities. These leasing arrangements typically involve the rental of a portion of the unused space on the pole for an annual fee, as well as reimbursement to the utility for all costs associated with preparing the pole for the cable attachment.

The petitioner in this case, Florida Power, is no stranger to this industry practice. In 1963, Florida Power entered into such an agreement with Cox Cablevision Corpora-

---

\* Honorable Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

tion (hereinafter "Cox"). Similar voluntary agreements were thereafter entered into by Florida Power with numerous other cable television companies, including Teleprompter Corporation and Teleprompter Southeast, Inc. (hereinafter "Teleprompter"), and Acton CATV, Inc. (hereinafter "Acton").

As the cable television industry began to boom in the 1960's, there was a general aura of discontent among the cable operators regarding their contracts with the telephone and electric power utilities. Undoubtedly the financial, economic and local franchise considerations made the use of preexisting pole networks the most feasible means of establishing a cable system. The cable operators complained, however, that the contracts proposed by the utilities frequently included arbitrarily determined rates as well as standard terms and conditions which were offered on a take-it-or-leave-it basis. Arguably the utilities enjoyed a superior bargaining position over the cable operators by virtue of their monopoly on the ownership and control of these poles.

In the late 1960's, cable companies began to complain that the utilities were exploiting their position by demanding unreasonably high attachment rates. The FCC investigated the allegations but concluded that it lacked jurisdiction because pole attachments did not constitute "communications by wire or radio" within the meaning of the Communications Act, 47 U.S.C. § 151 (1962). *California Water and Telephone Co.*, 64 F.C.C.2d 753, 758 (1977). *See generally* S.Rep. No. 580, 95th Cong., 2d Sess. 12–13 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 109, 120–21.

In the mid 1970's, at the urging of the cable television industry, Congress began to look into these alleged abuses of the utilities' monopoly power. Legislation was introduced and extensive hearings were held to address the issue. Finally, in 1978, Congress passed the Pole Attachments Act, 47 U.S.C. § 224. The Act authorized the

FCC, subject to preemption by state regulation, to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable." 47 U.S.C. § 224(b)(1). The Act then sets forth a rule or formula by which the FCC is to determine the "just and reasonable" rate for each particular situation. *See* 47 U.S.C. § 224(d)(1).

In addition, the Act gave the FCC authority to "adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions." 47 U.S.C. § 224(b)(1). In compliance thereof, the FCC issued a series of orders promulgating rules for administering the Act. *See First Report and Order in CC Docket 78–144*, 68 F.C.C.2d 1585 (1978); *Memorandum Opinion and Second Report and Order in CC Docket 78–144*, 72 F.C.C.2d 59 (1979), *aff'd, Monongahela Power Co. v. FCC*, 655 F.2d 1254 (D.C.Cir.1981); *Memorandum Opinion and Order in CC Docket 78–144*, 77 F.C. C.2d 187 (1980). In 1981, the United States Court of Appeals for the District of Columbia Circuit upheld the FCC's basic rulemaking decisions, *Monongahela Power*, 655 F.2d 1254, and in 1982, Congress extended the FCC's methodology by indefinitely repealing a "sunset" provision initially contained in the Act. *See* 47 U.S.C. § 224(e) (1978); [1] Conference Report on H.R. 3239, Communications Amendment Act of 1982, 128 Cong.Rec. H6537 col. 3 (daily ed. August 19, 1982). Since the passage of the Act in 1978, the FCC has resolved more than 100 pole attachment cases brought under § 224.

COURSE OF PROCEEDINGS

Availing themselves of the relief provided in the Pole Attachments Act, Teleprompter and Acton complained to the FCC that they were being overcharged by Florida Power under their existing pole attachment agreements. Teleprompter filed its complaint with the Common Carrier Bu-

---

**1.** The "sunset" provision, 47 U.S.C. § 224(e), initially provided that upon the expiration of the 5-year period that began on February 21, 1978,

the provisions of subsection (d) would cease to have any effect. This provision was removed by a 1983 Amendment, Pub.L. 97–259.

reau of the FCC on November 18, 1980. Prior to this time, Florida Power had been charging Teleprompter an annual rental rate per pole of $6.24. This rate was agreed to by the parties in a contract dated July 1, 1977. That contract further provided for rates of $6.51 for the year 1981, and $6.79 for the year 1982. Teleprompter's complaint requested the FCC to order a maximum annual rate of $2.23 per pole, to insert that rate into the contract between the parties, and to require Florida Power to refund to Teleprompter all monies paid in excess of that rate, with interest, from the date of the filing of the complaint.[2]

Acton filed its complaint against Florida Power on February 20, 1981. At the time the complaint was filed, Acton was paying Florida Power an annual rental rate of $7.15 per pole pursuant to two contracts between the parties entered into on June 16, 1980. Acton's complaint, which essentially modelled Teleprompter's, requested the FCC to order a maximum annual rate of no more than $2.21 per pole, to insert that rate into the contract between the parties, and to require Florida Power to refund, with interest, all monies paid in excess of that rate after the date the complaint was filed.[3]

Florida Power's response to each of these complaints was essentially the same. The utility contended that the requested relief, if granted, would effect a taking of private property without just compensation in violation of the Fifth Amendment. Florida Power also objected to the complaints on jurisdictional grounds, arguing that the requested relief exceeded the FCC's authority under the Act. Moreover, in regard to Teleprompter's complaint, the utility argued that the relief requested would retroactively nullify a contract predating the effective date of the Act, thus violating the Due Process Clause of the Fifth Amend-

ment. This argument, however, was not made in response to Acton's complaint because the Acton contract was entered into after the Act's effective date.

On July 16, 1981, the FCC's Common Carrier Bureau issued a *Memorandum Opinion and Order* (hereinafter "Teleprompter—Acton Order") responding to the Teleprompter and Acton complaints. The FCC found in favor of the cable companies in both instances and ordered an annual per pole rate of $1.79 for each; $.44 lower than the rate requested by Teleprompter and $.42 lower than the rate requested by Acton.

On August 11, 1981, Florida Power filed an application for review by the FCC pursuant to 47 C.F.R. § 1.115 (1984). While this application was pending, Cox filed its complaint against Florida Power with the FCC. Cox's initial agreement with Florida Power dated back to 1963 and provided for an annual rental rate of $5.50 per pole. In 1978, Florida Power had proposed a new rate of $6.86. The parties were unable to reach an agreement on this issue so Florida Power invoked a contractual provision authorizing a higher rate under such circumstances. Cox, however, continued to pay at the previous rate of $5.50 per pole. Florida Power responded by suspending Cox's rights under the contract. Nonetheless, the initial contract was still in effect when Cox filed its complaint against Florida Power.

On March 8, 1982, the Common Carrier Bureau issued a *Memorandum Opinion and Order* (hereinafter "Cox Order") granting Cox's request for imposition of a rate of $1.79 per pole. The substance of the Cox Order was virtually identical to the Teleprompter-Acton Order. Due to the contract dispute between the parties, however, this order did not grant a refund to

---

**2.** Teleprompter's initial complaint requested a maximum rate of $1.38 per pole. After reviewing Florida Power's response, however, Teleprompter modified its complaint to show a requested rate of $2.23. This revision was obviously prompted by information contained in Florida Power's response about which Teleprompter had no previous knowledge.

**3.** Acton's complaint initially requested a maximum rate of $2.23 per pole. After reviewing Florida Power's response, however, Acton also modified its complaint to show a requested maximum rate of $2.21 per pole.

Cox. Florida Power subsequently filed an application for review of the Cox Order with the FCC.

On September 28, 1984, more than three years after Florida Power filed its application for review of the Teleprompter-Acton Order, and more than two years after its application for review of the Cox Order was filed, the FCC, in a single order (hereinafter "Order"), denied both applications. The FCC's Order rejected Florida Power's constitutional arguments under the Takings and Due Process Clauses and in general language upheld all of the Common Carrier Bureau's decisions bearing on rate calculation.

Florida Power petitioned this court for review of the FCC's Order on October 5, 1984. Intervenors on behalf of Florida Power included Tampa Electric Company, Mississippi Power and Light Company and Alabama Power Company. The FCC, as respondent, received support on appeal from a number of intervening cable television companies, including Acton, Cox, and Group W Cable, Inc., the successor in interest to Teleprompter.

### THE APPLICABLE CASE LAW

Florida Power argues that the FCC's Order mandating an annual per pole rate of $1.79 in the case of Teleprompter, Acton and Cox amounted to a taking of property without just compensation in contravention of the Fifth Amendment.

In support of its argument, Florida Power relies primarily on the United States Supreme Court decision of *Loretto v. Teleprompter-Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). *Loretto* involved a New York statute which provides that a landlord must permit a cable television company to install cable components upon his property in return for an amount determined to be reasonable by the State Commission. Pursuant to that statute, the Commission had ruled that a one-time $1 payment was reasonable. The appellant, Jean Loretto, had purchased a five story apartment building in New York City and afterwards discovered cable equipment already in place along the building's exterior walls. Ms. Loretto

thereafter brought a class action suit for damages and injunctive relief, alleging *inter alia,* that the installation constituted a taking without just compensation. The New York courts rejected Loretto's argument and denied the requested relief.

On appeal, the United States Supreme Court held that the New York statute requiring a landlord to permit the installation of cable television facilities upon her property at a government-fixed rate worked a taking of that property requiring just compensation under the Fifth Amendment. In reaching this conclusion, the Supreme Court deemed applicable the traditional rule that "a permanent physical occupation of another's property is a taking." *Id.* at 435, 102 S.Ct. at 3175. After a thorough discussion of the general principles governing the Takings Clause, the Court concluded:

> Teleprompter's cable installation on appellant's building constitutes a taking under the traditional test. The installation involved a direct physical attachment of plates, boxes, wires, bolts and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall.

*Id.* at 438, 102 S.Ct. at 3177. The Court thereafter remanded for state court consideration the issue of the amount of compensation due.

The FCC contends that *Loretto* is not even remotely applicable to the instant case. They base this contention on what they perceive to be significant differences between the circumstances in *Loretto* and those in the case at hand. According to the FCC, the Supreme Court's conclusion that there was a taking in *Loretto* is based upon two factors: (1) there was an uninvited access to the property of the landlord by the cable company, and (2) the cable company's components constituted a permanent physical occupation of the landlord's property. These factors, the FCC argues, are not present in the instant case.

In regard to this argument, we have no disagreement with the FCC's interpretation of the factors underlying *Loretto*. What

troubles this court, however, is the attempt to distinguish *Loretto* by arguing that the factors underlying that decision are non-existent in the case of Florida Power.

The FCC points out that *Loretto* and the cases cited therein all involved what the FCC has termed an *uninvited access* to property. That factor, the FCC argues, is not present in the Florida Power case because Florida Power knowingly and voluntarily contracted with the cable companies for the installation of the cable network. Therefore, the FCC contends, the access to the poles was *invited,* not uninvited, and *Loretto* and its predecessors do not apply.

■ Assuming for the moment that Florida Power's actions can be construed as an invitation to access its poles, it is nonetheless clear that that invitation was made subject to and based upon certain conditions, namely the agreed upon annual per pole rate. To the extent the cable companies complied with the terms of their agreements, their occupation might well be construed as invited. But by insisting on a significantly lower rate, the cable companies have themselves transformed their status from that of an invitee, to use their own terms, to that of an unwanted guest. While they may have been invited at the outset, they certainly weren't invited at the rate imposed by the FCC. In our opinion, the cable companies' occupation of Florida Power's poles at the rate specified by the FCC is anything but invited.

The FCC, however, carries the argument a step further. It claims that although Florida Power would naturally prefer the higher rates, it still welcomes the cable companies' presence even at the new lower rates. According to the FCC, this is evident from the fact that Florida Power has taken no steps to exclude the cable companies. Therefore, the FCC argues, the cable companies' presence can still be construed as invited and *Loretto* does not apply.

In our opinion, this argument simply ignores reality. The hard reality of the matter is that if Florida Power desires to exclude the cable companies, for whatever reason, they are powerless to do so. We say this because in previous cases where utilities have ordered cable companies to disconnect, the FCC has routinely intervened by issuing temporary stays which prevent the exclusion of the cable companies. *See Whitney Cablevision v. Southern Indiana Gas & Electric Co.,* Mimeo 841 (Nov. 16, 1984); *Tele-Communications, Inc. v. South Carolina Electric & Gas Co.,* Mimeo 5957 (Aug. 16, 1983). Thus we can predict with some confidence what the FCC's response would be should Florida Power attempt to do the same.[4] The fact that Florida Power has not undertaken what obviously would be a futile attempt at excluding the cable companies is by no means an indication that Florida Power invites or even accepts the cable companies' presence at the FCC-imposed rates.

Consequently, we conclude that *Loretto* is not distinguishable from the instant case on the basis of uninvited access. We therefore turn to the FCC's second argument as to why *Loretto* does not apply.

The FCC contends that *Loretto* is not applicable to the Florida Power situation because Florida Power is not faced with a *permanent* physical occupation by the cable companies. It is not permanent, argues the FCC, because the physical occupation is pursuant to a contract for a term of years and can thereafter be terminated. For the reasons which follow, we reject this argument.

First of all, the FCC's argument presupposes that when the cable companies' contracts expire, Florida Power will be free to refuse to renew those agreements. As we intimated earlier, however, we have no

---

4. The FCC contends that *Whitney,* Mimeo 841, and *TeleCommunications,* Mimeo 5957, should not be relied upon as indicators of how the FCC would respond should Florida Power try to exclude the cable companies. According to the FCC, the issuance of the temporary stays in those two cases was necessary to prevent "retali- atory" action by the utilities involved. It is difficult for us to imagine, however, how Florida Power, or any utility for that matter, could issue a disconnect order under such circumstances and have it escape being deemed retaliatory by the FCC. Consequently, the FCC's argument on this matter is unpersuasive.

doubt that Florida Power would face considerable difficulty in trying to exclude the cable companies. This holds true regardless of whether the disconnect order is issued prior to or after the expiration of the contract period. In fact the FCC has made it quite clear that it intends to require continued provision of space at FCC-ordered rates. In anticipation of such events, the FCC has stated: "Even where there is currently no [cable television] attachment or agreement thereof, the Commission has jurisdiction if: (1) there is communication space designated on the poles and (2) the utility has discontinued [cable television] attachment in order to avoid such Commission jurisdiction." *First Report, supra,* 68 F.C.C.2d at 1589. In terms of permanency then, the fact that this physical occupation is pursuant to a contract for a term of years is by no means proof that the physical occupation will cease at any particular time.

 In any event, this distinction is overstated and in our opinion irrelevant. It is apparent from *Loretto* that when the Court speaks in terms of a permanent physical occupation, it does not necessarily mean that the occupation is one which will last forever. In fact the Court noted that the property owner in *Loretto* could force the cable company to disconnect at any time by simply occupying the building herself, or by converting it to commercial property. 458 U.S. at 439 and n. 17, 102 S.Ct. at 3178 and n. 17. Florida Power on the other hand, must at the very least wait until the contracts expire, and even then it is doubtful whether Florida Power would be able to exclude the cable companies. Consequently, the extent of the occupation in the case of Florida Power not only satisfies *Loretto's* permanency requirement, but significantly exceeds it.

The crux of the matter then is that the FCC's emphasis on the extent of the occupation is misplaced. *Loretto* indicates that in resolving the taking issue, the focus should be placed not on the extent of the occupation, but rather on the nature of the physical attachment itself:

> [W]hether a permanent physical occupation has occurred presents relatively few

problems of proof. The placement of a fixed structure on land or real property is an obvious fact that will rarely be subject to dispute. Once the fact of occupation is shown, of course, a court should consider the *extent* of the occupation as one relevant factor in determining the compensation due. For that reason, moreover, there is less need to consider the extent of the occupation in determining whether there is a taking in the first instance.

*Id.* at 437–38, 102 S.Ct. at 3177 (emphasis in original). In regard to the physical attachment then, *Loretto* and the instant case are virtually indistinguishable; they both involve the placement of plates, boxes, wires, bolts and screws upon the property of a reluctant owner. Moreover, to the extent that a permanent physical occupation includes some element of permanency, we conclude that the instant case satisfies that element as set forth in *Loretto*.

 For the aforementioned reasons, we conclude that the instant case is not distinguishable from *Loretto* on the basis of either uninvited access or permanency of the occupation. *Loretto* therefore controls, and based on that decision, we hold that the FCC's Order effected a taking of Florida Power's property.

## THE JUST COMPENSATION ISSUE

Having concluded that the FCC's Order worked a taking of Florida Power's property, the next issue which naturally arises concerns the amount of compensation due. Florida Power argues that in mandating a rental rate of less than one-third the rates originally agreed upon, the FCC has deprived it of just compensation in violation of the Fifth Amendment. While this may or may not be true, it is our opinion that an even more fundamental question must first be addressed: Does the FCC, an administrative agency, have the power to determine what is or is not just compensation for purposes of the Fifth Amendment Takings Clause? In our opinion, it does not.

It appears to this court that the determination of what constitutes just compensa-

tion is a decision which has been jealously guarded as being solely within the parameters of the judicial function. For example, in the early case of *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893), the Supreme Court had the opportunity to address this issue. In *Monongahela*, Congress had enacted legislation which authorized the Secretary of War to negotiate for, or in the alternative to take, a lock and dam located on the Monongahela River, and to pay the owner of that lock and dam, the Monongahela Navigation Company, a purchase price not in excess of $161,733.13. As regards the just compensation issue, the Court stated:

> By this legislation, Congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial and not a legislative question. The legislature may determine what private property is needed for public purposes—that is a question of a political and legislative character; but when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.

*Id.* at 327, 13 S.Ct. at 626. The Court then went on to quote with approval the following language from the Mississippi Supreme Court's decision in *Isom v. Mississippi Central R.R.*, 36 Miss. 300 (1858):

> The rights of the legislature ... to apply the property of the citizen to the public use, and then to constitute itself the judge in its own case, to determine what is the 'just compensation' it ought to pay therefor, or how much benefit it has conferred upon the citizen by thus taking his property without his consent, or to extinguish any part of such 'compensation' by prospective conjectural advantage, or *in any manner* to interfere with the just powers and province of courts and juries

in administering right and justice cannot for a moment be admitted or tolerated under our Constitution. If anything *can be* clear and undeniable, upon principles of natural justice or constitutional law, it seems that this must be so.

*Monongahela*, 148 U.S. at 327–28, 13 S.Ct. at 627 (emphasis in original) (quoting *Isom*, 36 Miss. at 315).

More recently, several United States Court of Claims decisions have relied on *Monongahela* in striking down legislatively imposed standards for just compensation. For example, in *Miller v. United States*, 620 F.2d 812, 223 Ct.Cl. 352 (1980), the United States effected a taking of some 2,646 acres of timberland for inclusion in the Redwood National Forest. While the parties at trial stipulated to the fair market value of the timberland, a question remained concerning the interest rate which should apply to the delay in payment of just compensation. Prior to this taking, Congress had enacted legislation which mandated that a 6% interest rate was an appropriate rate of interest to cover such delays. The Court of Claims, however, relying on *Monongahela*, held that the 6% rate was not binding on the court. *Id.*, 620 F.2d at 837. The court stated that "the determination of just compensation under the fifth amendment is exclusively a judicial function," and that "[i]t does not rest with Congress to say what compensation shall be paid, or even what shall be the rule of compensation." *Id. See also United States v. 15.3 Acres of Land*, 154 F.Supp. 770, 783 (M.D.Pa.1957) (ascertainment of just compensation is a judicial function and no power exists in any other department of government to declare what the compensation shall be or to prescribe any binding rule in that regard).

In another Court of Claims decision, *American-Hawaiian Steamship Co. v. United States*, 124 F.Supp. 378, 129 Ct.Cl. 365 (1954), *cert. denied*, 350 U.S. 863, 76 S.Ct. 103, 100 L.Ed. 766 (1955), the United States War Shipping Administration (hereinafter "WSA") effected a taking of a privately owned steam freighter for military use during World War II. The WSA derived its authority for such takings from

the Merchant Marine Act of 1936, 46 U.S.C.A. 1242. Pursuant to this Act, the WSA issued General Order No. 37, which fixed a basic bareboat charter rate of $1.25 per deadweight ton per month for such vessels. As in *Miller*, the Court of Claims held that it was not bound by the WSA imposed rate, and that $2.50 per deadweight ton per month was "just" to both parties. *American-Hawaiian*, 124 F.Supp. at 384. In reaching this conclusion, the court stated:

> The ascertainment of just compensation is not an administrative but a judicial function; no power exists in any administrative agency of the Government to declare what that compensation should be or to prescribe any binding rule in that regard.

*Id.* at 382–83 (citing *Monongahela*, 148 U.S. at 327, 13 S.Ct. at 626).[5]

■ The Pole Attachments Act clearly runs afoul of the principles set forth in the Fifth Amendment and in the aforementioned cases. Section (d)(1) of the Act provides as follows:

> (d) Determination of just and reasonable rates; definition
>
> (1) For purposes of subsection (b) of this section, *a rate is just and reasonable* if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

47 U.S.C. § 224(d)(1) (emphasis added). By prescribing a "binding rule" in regard to

the ascertainment of just compensation, Congress has usurped what has long been held an exclusive judicial function. *See Monongahela*, 148 U.S., at 327, 13 S.Ct. at 626; *Miller*, 620 F.2d at 837; *U.S. v. 15.3 Acres*, 154 F.Supp. at 783; *American-Hawaiian*, 124 F.Supp. 382–83. As the Supreme Court held in *Monongahela*, such interference "with the just powers and province of courts and juries in administering right and justice, cannot for a moment be admitted or tolerated under our Constitution." *Monongahela*, 148 U.S. at 327–28, 13 S.Ct. at 627. Because the Act does not allow for a judicial determination of what constitutes just compensation, it is in this court's opinion, unconstitutional.

CONCLUSION

■ The FCC's Order authorizing cable operators to occupy space on Florida Power's poles effected a taking of property for which just compensation is due. The determination of just compensation, however, was constitutionally inadequate in this case because it was made by an administrative agency at the behest of Congress rather than by judicial inquiry as required by law. The Pole Attachments Act, pursuant to which this Order was issued, does not properly allow for a judicial determination of just compensation, but instead prescribes a rule by which the FCC is to determine the maximum allowable rates. For the legislature to take the property of a person and then to constitute itself the judge in its own case, to determine what is "just compensation," offends our most fundamental principles of natural justice and constitutional law. The determination of just compensation is clearly a judicial function. To the extent that this Act deviates from this well-established principle, we hold it unconstitutional.[6]

5. In holding as it did, the Court of Claims emphasized that the constitutional requirement that the government must pay just compensation for what it takes for public use is one which war does not suspend, alter or modify. *American-Hawaiian*, 124 F.Supp. at 382.

6. Florida Power also raises the issue of whether the Order, insofar as it abrogated contracts in existence prior to the effective date of the Pole Attachments Act, deprived Florida Power of

property without due process of law contrary to the provisions of the Fifth Amendment. In light of our disposition of appellant's taking claim, we see no need to address this contention.

We also note that had we not found that the FCC's Order constituted a taking, we would have been compelled to address the alternative argument of Florida Power, that being whether the rate calculated by the FCC was arbitrary and capricious. This of course, would have entailed a different standard of review altogether. In

This holding, of course, relates to the taking by the federal government, which regulates cable television. We express no opinion whatsoever as to any issues that might be raised if a state agency charged with the responsibility of regulating the power company as a public utility sought to exercise some control or rate-making procedures concerning attachments to the company's utility poles.

The FCC's Order is, therefore, VACATED.

such cases, the focus is, as Florida Power points out, whether the Order is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A) (1977).