**GULF POWER COMPANY,**
**et al., Plaintiffs,**

v.

**UNITED STATES OF AMERICA,**
**et al., Defendants.**

**No. 3–96–CV–381/LAC.**

United States District Court,
N.D. Florida,
Pensacola Division.

March 6, 1998.

Ralph Alan Peterson, Beggs & Lane, Pensacola, FL, John Russell Campbell, S. Allen Baker, Balch & Bingham, Birmingham, AL, Karl R. Moor, Suzanne Alldredge, Balch & Bingham, Washington, DC, Richard E. Jones, Hunton & Williams, Raleigh, NC, for Plaintiffs.

Theodore C. Hirt, U.S. Department of Justice, Civil Division, Washington, DC, Brian G. Kennedy, U.S. Dept of Justice, Civil Div, Washington, DC, Richard J. Metzger, Assoc. for Local Telecommunications Serv., Washington, DC, for Defendants.

Robert G. Scott, Jr, Cole, Raywid & Braverman, Washington, DC, Anthony C. Epstein, Jenner & Block, Washington, DC, Michael Eugene Kinney, William B. Graham, Bateman & Graham, PA, Tallahassee, FL, for National Cable, amicus, Cable Telecommunications Association, amicus, Alabama Cable Telecommunications Association, amicus, Florida Cable Telecommunications Association, amicus, Cable Television Association of Georgia, amicus, Cable Telecommunications Association of Maryland, Delaware, and District of Columbia, amicus, Mississippi Cable Television Association, amicus, Ohio Cable Telecommunications Association, amicus,

Texas Cable & Telecommunications Association, amicus.

## SUMMARY JUDGMENT

COLLIER, District Judge.

Pending before the Court is Plaintiffs' motion for summary judgment and documents in support thereof (docs.38–41). Also before the Court are both Defendants' and Intervenors' motions for summary judgment (docs.46, 54) and their supporting memoranda (docs.47, 55) and evidentiary materials (docs.49, 56). All parties have reply memoranda in response (docs.59, 65, 66, 68). Furthermore, *Amici curiae* have filed with the Court memoranda in support of Defendants' and opposition to Plaintiffs' motions for summary judgment (doc. 50) as well as supporting documentation (doc. 51). The Court has taken the motions for summary judgment under advisement (doc. 45) and, with the aid of oral arguments, is now prepared to rule on the pending motions. For the reasons stated below, Plaintiffs' motion for summary judgment is **DENIED**. Defendants' and Intervenors' motions for summary judgment are **GRANTED**.

### I. STATEMENT OF THE CASE

#### A. Background

As enacted in 1978, the Pole Attachment Act ("Act") empowered the Federal Communications Commission ("FCC"), in the absence of parallel state regulation, to determine "just and reasonable" rates that utility companies could charge cable television systems for using utility poles as a physical medium for stringing television cable. 47 U.S.C. § 224(b)(1) (1991). The Act also provided for a range of reasonableness within which the FCC could set rates. *Id.* at § 224(d)(1). This range defined the minimum rate as the marginal cost of providing pole attachments, while the maximum rate a utility could charge was the fully allocated cost of construction and operation of each

pole to which the television cable was attached. *Id.*

Recognizing the benefits and need for competition in the rapidly expanding telecommunications industry, Congress passed the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996),[1] which made several significant amendments to the Pole Attachment Act. The Act now provides that "[a] utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it." 47 U.S.C. § 224(f)(1) (1991 & Supp. 1997). A utility who owns or controls poles, conduits, or right-of-way and uses them in whole or in part for wire communications may only deny access on a nondiscriminatory basis where there is "insufficient capacity and for reasons of safety, reliability and generally applicable engineering services." *Id.* at §§ 224(a)(1) & (f)(2).

Significant in the amendments and serving as the primary issue now before the Court, is this "mandatory access" requirement which imposes an obligation on qualifying utilities to provide nondiscriminatory access to their poles and conduits. This mandate was not part of the Act as enacted in 1978 and was added as a means "to remedy the inequity for pole attachments among providers of telecommunications services." H.R.REP. No. 104–204, pt. 1, at 92 (1995). In its promulgation of the "mandatory access" requirement, however, Congress did not abandon the rate formula established in 1978.[2] Indeed, the Act still empowers the FCC to determine "just and reasonable" rates pursuant to § 224(d)(1). It is this legislative delegation of power to the FCC which serves as the second principal issue before the Court today.

The Plaintiffs[3] ("Utilities") are all power companies which fall under the definition of a utility as contemplated by the Act, 47 U.S.C.

---

1. Now codified at 47 U.S.C. § 151 *et seq.*

2. In fact, Congress extended the usage of the formula indefinitely when it amended the Act in 1982. *See* Act of Sept. 13, 1982, Pub.L. No. 97–259 (striking out subsection (e) providing for a five-year expiration period for determination of "just and reasonable rates.").

3. The Plaintiffs are Gulf Power Company, Alabama Power Company, Georgia Power Company, Mississippi Power Company, Ohio Edison Company, Duke Power Company, and Florida Power Corporation

§ 224(a)(1) (Supp.1997), and each owns or controls poles, ducts, conduits, and private right-of-ways in the United States (doc. 41). Although their primary business is the generation, transmission, and distribution of electricity, the Utilities also use the poles, conduits, ducts, and right-of-ways for wire communications (*id.*). The Utilities further acknowledge that they have access to and facilities located on public rights-of-way for which they have been given condemnation rights and have in the past frequently negotiated and entered into private pole attachment agreements with cable companies (*id.*).

### B. Procedural History

The Utilities filed the present action in this Court seeking both declaratory and injunctive relief (doc. 1: ¶ 2). Pursuant to 28 U.S.C. § 2201, the Utilities seek a declaration that the "mandatory access" provision of the Act, 47 U.S.C. § 224(f), is unconstitutional on its face and without force of law (doc. 1). The Utilities also seek to permanently enjoin and restrain the United States and the FCC ("Defendants") from enforcing that provision against them (*id.*). The Utilities argue that the provision is unconstitutional, as the Act's mandate to provide access in a nondiscriminatory manner constitutes a taking without just compensation as required by the Fifth Amendment of the Constitution of the United States. U.S. CONST. AMEND. V.

The Association for Local Telecommunications Services ("ALTS") and American Communications Services, Inc. ("ACSI")[4] intervened as party defendants ("Intervenors"), asserting interests in the litigation which could not otherwise be adequately protected by the United States and the FCC (docs.8, 26, 27). Furthermore, the Court has permitted several national and state cable television associations[5] to participate as *Amici curiae*

in the present action (doc. 18). These *Amici* represent the owners and operators of over 11,000 cable systems throughout the United States and have a substantial interest in the outcome of the instant case (doc. 17). They seek to inform and assist the Court from the perspective of the cable industry and its prior experience in negotiating access to the poles, ducts, and conduits at issue here (doc. 17).

The Utilities, Defendants, and Intervenors have all moved for summary judgment (docs.38, 46, 54) and filed memoranda in support of their respective motions (docs.40, 47, 55).[6] The parties have also submitted statements of facts pertinent to the issues before the Court (doc. 39, 49, 56). Moreover, the Utilities have filed affidavits in support of their motion (doc. 41), to which Defendants have responded (doc. 48).

*Amici* also filed a memorandum in support of Defendants' and Intervenors' motions for summary judgment which likewise served as opposition to the Utilities' motion (doc. 50). They additionally filed a statement of facts (doc. 51) referencing the affidavit of Scott Weber and exhibits filed therewith (doc. 50, attch. A & exh. 1); however, those materials have been stricken from the record, (doc. 75). The Court did state in its order granting the motion to strike that it would still consider *Amici's* memorandum and all of the legal, legislative, and administrative citations made therein, all of which are now properly before the Court (*id.*).

The Court has taken summary judgment under advisement (doc. 45), heard oral argument from the parties, and is now prepared to rule on the pending motions. After considering all materials submitted in support of and opposition to the motions for summary

---

4. ALTS is a non-profit, national trade association representing telecommunications companies who provide and desire to provide local access and local exchange telecommunications services in competition with established telephone companies (doc. 8). ACSI is a telecommunications service provider entitled to certain statutory rights under the Act (doc. 26).

5. The various associations are the National Cable Television Association, the Cable Telecommunications Association, the Alabama Cable Telecommunications Association, the Florida Cable

Telecommunications Association, the Cable Television Association of Georgia, the Cable Telecommunications Association of Maryland, Delaware, and District of Columbia, the Mississippi Cable Television Association, the Ohio Cable Telecommunications Association, and the Texas Cable & Telecommunications Association (doc. 17).

6. These memoranda in support also serve as the parties' opposition memoranda. Furthermore, reply briefs have been submitted by all parties and *Amici* (docs.59, 65, 66, 68).

**1390**

judgment, Plaintiffs' motion for summary judgment (doc. 38) is **DENIED**. For the reasons stated below, Defendants' and Intervenors' motions for summary judgment (docs.46, 54) are **GRANTED**.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the party moving is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Id.*

In the instant case, no genuine issues of material fact exist precluding summary judgment for any party. The language of the Act is clear and the parties maintain that the constitutionality considerations at issue are properly resolved at the summary judgment stage. Furthermore, where a facial challenge to a statute is at issue, it is not whether the statute is constitutional as to the specific set of circumstances before the court, but whether that statute would be facially invalid in *all* or at least *most* cases.[7]

### B. Discussion

In challenging the constitutionality of the Act, Plaintiffs maintain that the non-discriminatory access provision of § 224(f) constitutes a physical taking of property as con-

templated by the Fifth Amendment (doc. 40:7). Plaintiffs further argue that because the provision amounts to a taking, the Constitution guarantees them just compensation to be initially determined by the courts and not the FCC (*id.* at 14). In evaluating Plaintiffs' assertions, the Court is presented with two basic issues: (1) whether the non-discriminatory provision of the Act constitutes a taking under the Takings Clause, and (2) whether an initial determination of just compensation pursuant to Fifth Amendment jurisprudence is required to be made by the judiciary as opposed to the FCC. Although resolution of the second issue in favor of Defendants and Intervenors technically obviates the need to address the first, the Court will undertake its analysis today in a more logical progression, first addressing whether the Act is a taking under the Fifth Amendment and then proceeding to the compensation issue.

### 1. WHETHER THE NON–DISCRIMINATORY ACCESS PROVISION CONSTITUTES A TAKING UNDER THE FIFTH AMENDMENT

The Fifth Amendment of the Constitution protects owners of private property from the "taking" of property without "just compensation."[8] Although simple in its wording, the question of what constitutes a taking has been a problem of considerable complexity to the courts. In addressing these Fifth Amendment concerns, the Supreme Court has noted that no "set formula" exists for "determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S.

---

7. The Court notes that the precise standard applied in a facial challenge is still a subject of much disagreement, even among members of the Supreme Court. "[S]ome Justices interpret Supreme Court precedent to indicate that a statute is not facially invalid unless there is *no* set of circumstances in which it would operate constitutionally; others contend the cases require only that a statute would operate unconstitutionally in *most* cases." *Florida League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 516, 136 L.Ed.2d 405 (1996) (comparing *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, —— & n. 1, 116 S.Ct. 1582, 1583 & n. 1, 134 L.Ed.2d 679 (1996) (mem.) (Stevens, J.) *with id.* at 1586 (Scalia, J., dissenting from denial of certiorari)). However, because the Act at issue here would operate constitutionally in either case, the Court need not address which standard is the proper one to apply.

8. The Takings Clause provides, "private property [shall not] be taken for public use without just compensation." U.S. CONST. AMEND. V.

104, 123–24, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (citing . *Goldblatt v. Town of Hempstead, N.Y.,* 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962)). Rather, the determination of whether a particular restriction amounts to a taking will depend largely upon the particular circumstances of the case. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. However, these "essentially ad hoc, factual inquiries" are not standardless, and the Supreme Court has identified several factors significant to the determination:

> The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, or course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.* (citations omitted), *quoted in, Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982).

Although the Court has upheld substantial regulation of an owner's use of his own property where necessary to promote the public interest, it has "long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause." *Loretto,* 458 U.S. at 426, 102 S.Ct. at 3171.[9] While recognizing the importance of *Penn Central*'s multi-factor inquiry, the *Loretto* Court promulgated a *per se* rule making the element of physical invasion of property determinative of whether a taking had occurred. *Id.* The Court indicated that when a physical

intrusion reaches the extreme form of permanent physical occupation, a taking has occurred. *Id.* The character of that type of government action is not only an important factor in resolving whether the action works a taking, it is determinative. *Id.* at 426, 434–35, 102 S.Ct. at 3171, 3175 ("[W]hen the 'character of the governmental action' is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." (citations omitted)).

The *Loretto* Court further emphasized the importance of an owner's right to possess, use, and dispose of property. *Id.* at 435, 102 S.Ct. at 3176. To the extent that the government permanently occupies physical property, it abrogates each of these rights. "The power to exclude has traditionally been considered on of the most treasured strands in an owner's bundle of property rights." *Id.* at 435–36, 102 S.Ct. at 3176. An owner whose property has been permanently occupied has no right to occupy the space himself, nor does he have the right to exclude the occupier from possession and use of the space.' *Id.* Moreover, in finding a taking the *Loretto* Court was not concerned with the size of the area permanently occupied. Indeed, "whether [a permanent occupation] is a taking does not depend on whether the volume of space it occupies is bigger than a breadbox." *Id.* at 438, 102 S.Ct. at 3177.

■ Although admittedly narrow in application, *Loretto* constructed a rigid *per se* takings rule: "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve. Our constitutional history confirms the rule, recent cases do not question

9. In *Loretto* the Court reviewed a New York statute which prohibited an owner of rental property from interfering with the installation of cable television facilities upon his property or premises and provided that the landlord could charge cable operators for access to the property an amount which the state commission determined, by regulation, to be reasonable. The landlord challenged the statute after finding that cables and switching boxes for the provision of cable had previously been mounted to the building.

The Court held that the physical occupation of the landlord's property which occurred in connection with the cable attachments constituted a taking without regard to the public interest the statute may have served. The Court then remanded for a determination of whether just compensation had been paid. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

it, and the purposes of the Takings Clause compel its retention." *Id.* at 426, 102 S.Ct. at 3171.

Shortly after the Supreme Court decided *Loretto*, the Eleventh Circuit addressed issues similar to those now before the Court. *See Florida Power Corp. v. FCC*, 772 F.2d 1537 (11th Cir.1985), *rev'd*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987). Relying on the *per se* rule announced by the Supreme Court, the Eleventh Circuit held in *Florida Power* that an FCC order issued pursuant to the original, 1978 Pole Attachment Act ("1978 Act") amounted to a taking of private property for which just compensation was due under the Takings Clause, as the Act had authorized a permanent physical occupation of property.[10] 772 F.2d at 1539–43 ("[W]e conclude that *Loretto* is not distinguishable from the instant case on the basis of uninvited access.").

On appeal, however, the Supreme Court found that the Eleventh Circuit's reliance on *Loretto* was misplaced. *FCC v. Florida Power Corp.*, 480 U.S. 245, 250–53, 107 S.Ct. 1107, 1111–12, 94 L.Ed.2d 282 (1987). In distinguishing *Florida Power* from *Loretto*, the high Court made a crucial distinction—the Pole Attachment Act, as enacted in 1978, did not contain the essential element of required acquiescence which is "at the heart of the concept of occupation." *Id.* at 252, 107 S.Ct. at 1112. "The line which separates [*Florida Power*] from *Loretto* is the unambiguous distinction between a commercial lessee and an interloper with a government license." *Id.* at 252–53, 107 S.Ct. at 1112.

The Pole Attachment Act at issue in *Florida Power* authorized the FCC, in the absence of parallel state regulation, "to review the rents charged by public utility landlords who have *voluntarily entered into leases*

with cable company tenants renting space on utility poles." *Id.* at 251–52, 107 S.Ct. at 1111–12 (emphasis added). In finding *Loretto* inapplicable, the Court characterized its holding in that case as "very narrow" and found that "while the statute . . . considered in *Loretto* specifically required landlords to permit permanent occupation of their property by cable companies, nothing in the Pole Attachment Act as interpreted by the FCC . . . [gave] cable companies any right to occupy space on utility poles, or prohibit[ed] utility companies from refusing to enter into attachment agreements with cable operators." *Id.* It was this distinction which the Eleventh Circuit failed to make and which served as the basis for reversal.[11] *Id.* at 252–53, 107 S.Ct. at 1112. As a basis for its conclusion, the Court noted that the language of the 1978 Act provided no explicit authority to the FCC to require pole access for cable operators and that the legislative history strongly suggested that Congress intended no such authorization. *Id.* at 251 n. 6, 107 S.Ct. at 1111 n. 6.

Although the Court ultimately held the 1978 Act constitutional, it cautioned that it had not considered "what the application of *Loretto v. Teleprompter Manhattan CATV Corp.* would be if the FCC in a future case required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements." *Id.* (citation omitted). The future is here, and the Court looks to *Loretto* for guidance in the instant action.

The Pole Attachment Act, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.*, provides that "[a] utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it." 47

---

10. This finding alone did not render the 1978 Pole Attachment Act unconstitutional. After determining that the FCC's order effected a taking of Florida Power's property, the court proceeded to examine whether Florida Power received just compensation as required by the Fifth Amendment. 772 F.2d at 1544. However, as will be discussed *infra* Part II(B)(1), the court, declining to address the specific valuation issues, answered the more fundamental question of whether the FCC has the power to determine what constitutes just compensation for purposes of the Fifth Amendment Takings Clause. *Id.*

11. After finding that the 1978 Act did not authorize a permanent occupation of physical property which would otherwise result in a taking, the Court proceeded to examine whether the FCC order effected a taking under traditional Fifth Amendment standards—that is, whether the regulation of rates by the FCC was so confiscatory that it offended constitutional protections. 480 U.S. at 253, 107 S.Ct. at 1112. The Court found that it did not and subsequently upheld the Act. *Id.* at 253–54, 107 S.Ct. at 1112–13.

U.S.C. § 224(f)(1) (1991 & Supp.1997). This nondiscriminatory access provision, requiring that all qualifying utilities provide access to any telecommunications or cable television system carrier, bears the element of required acquiescence which the Supreme Court found notably absent in *Florida Power*. The provision simply leaves no choice for the utilities as they are defined in the Act.[12]

Defendants and Intervenors argue that the Act does in fact leave a utility with a choice. They assert that a utility who does not own or control poles or ducts for wire communication is not required to provide nondiscriminatory access to telecommunications or cable system carriers (docs.47:21, 55:11–12). While this is indeed true, it is of no significance to the issues now presented before the Court. The Act only applies to those persons who are defined as "utilities" under § 224(a)(1). 47 U.S.C. § 224(a)(1) (1991 & Supp.1997). This includes "any person who is a ... public utility, and who owns or controls poles, ducts, conduits, or right-of-way used, in whole or in part, for any wire communications." *Id.* By reference to this definition alone, any person who does not qualify is *not* a utility as contemplated by the statute. These "wireless" utilities [13] are simply not subject to the Act's provisions, and any argument that they are somehow making a choice within the confines of the Act is unfounded.

Defendants and Intervenors would counter that it is exactly that "choice" not to carry wire communications which renders the nondiscriminatory provision essentially voluntary. However, viewing the argument from a different perspective, the Court finds that these "wireless" utilities never made the choice in the first place. This is evidenced by the fact that, at the outset, a "wireless"

utility is *by definition* not governed by the Act. The "wireless exception," as Defendants might characterize it, is not part of a subsection to the nondiscriminatory access provision, but rather a prerequisite to its application. A "wireless" utility is not *permitted* to voluntarily deny access but rather is merely not governed by the nondiscriminatory access provision at all. The Act is as applicable to these "wireless" utilities as it is to cattle ranchers or health care providers, neither of whom would argue that they have a "choice" to deny access.[14]

Moreover, the Supreme Court rejected a similar argument presented in *Loretto*. 458 U.S. at 439, 102 S.Ct. at 3178. The cable company argued that the landlord could avoid the mandatory access requirements of the statute at issue by ceasing to rent the building to tenants—effectively removing it from the scope of its regulations. *Id.* at 439 n. 17. The Court firmly rejected this contention, stating that "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Id.* The Court did not consider the statute's access requirement as anything other than a permanent physical invasion, even though the landlord had the "choice" not to rent the building to tenants. *Id.* at 439, 102 S.Ct. at 3178 ("So long as the property remains residential and a CATV company wishes to retain the installation, the landlord must permit it.").

The *Loretto* Court's conclusions as discussed immediately above also undermine Defendants' reliance on *General Telephone Co. v. United States*, 449 F.2d 846, 860–61 (5th Cir.1971). In upholding an FCC rule which required that telephone companies

---

**12.** Although not a "choice," utilities can deny access where there is insufficient capacity and for reasons for safety, reliability, and generally applicable engineering purposes. 47 U.S.C. § 224(f)(2) (1991 & Supp.1997). This limited exception, however, has no bearing on the Court's analysis as those circumstances provide the opportunity to deny access only where it would otherwise be unsafe or impractical and without the more subjective and voluntary element of choice.

**13.** The term "wireless" is not a designation with legal or statutory significance but rather a means

for the Court to refer to utilities whose poles, ducts, conduits, and right-of-way are not used for wire communications

**14.** Of course, Defendants would be quick to point out that cattle ranchers and health care providers do not own the poles and conduits that utilities do, whether "wireless" or not. The Court simply uses this example to emphasize its point that the Act is of no consequence to those persons which do not fall within its definition of a utility.

seeking to construct cable facilities must first offer CATV operators space on the companies' poles or conduits, the court held that the mandatory provision of the rule did not offend the constitutional protections of the Fifth Amendment. *General Tel. Co.*, 449 F.2d at 860–61. It found that "the pole space requirement is not a deprivation of property since the companies need be engaged in furnishing facilities for CATV only on a volitional basis. Viewed in that light the pole space requirement is simply a condition to entry into the CATV business." *Id.* at 860. Standing alone, *General Telephone* would be compelling and indeed binding on this Court.[15] However, *General Telephone* is a 1971 case decided over a decade before the Supreme Court's landmark ruling in *Loretto* and without that Court's instruction. By itself, that may not be significant; however, this Court finds that in light of *Loretto* and its progeny, it would be unwise and inconsistent to continue down *General Telephone's* path, a road that has never been followed or even examined to this day by any court.[16]

Defendants' and Intervenors' also argue that because the Utilities acquired right-of-ways, poles, and conduits via the sovereign exercise of eminent domain, they never realized a right to exclude other public actors desiring access to those properties (docs. 47:14; 55: 8). The parties rely on *Duquesne Light Co. v. Barasch* which recognized that the "partly public, partly private status of utility property creates its own set of questions under the Taking Clause of the Fifth Amendment." 488 U.S. 299, 307, 109 S.Ct. 609, 615, 102 L.Ed.2d 646 (1989). The Court continued that "[t]he guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory.... If the rate

does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Id.* at 308–09, 109 S.Ct at 615–16 (citations to various rate regulation cases omitted).

■ However, *Duquesne*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646, is of no consequence to this Court's ruling today, as the *Duquesne* Court did not address the Takings Clause in the context of a permanent occupation of property, the type of action at issue in both *Loretto*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868, and here. Rather, *Duquesne* focused on more traditional Fifth Amendment standards—whether the rates fixed by the state were so unreasonable and confiscatory that they amounted to an unconstitutional taking of property. 488 U.S. 299, 307–08, 109 S.Ct. 609, 615–16 (holding that state scheme of utility regulation disallowing recovery of capital investments is not a taking of property). That Fifth Amendment regulatory analysis is separate from this Court's inquiry into whether the Act amounts to a taking under the *per se* rule set forth in *Loretto*. *See Florida Power*, 480 U.S. at 253, 107 S.Ct. at 1112. Moreover, "the facts that an industry is heavily regulated, and that a property owner acquired the property knowing that it is heavily regulated, do not diminish a physical taking to something less than a taking." *GTE Northwest, Inc. v. Public Util. Comm'n*, 321 Or. 458, 900 P.2d 495, 504 (1995), *quoted in*, J. Gregory Sidak & Daniel F. Spulber, *Deregulatory Takings and Breach of the Regulatory Contract*, 71 N.Y.U.L.Rev. 851, 951–52 (1996) [hereinafter Sidak & Spulber, *Deregulatory Takings* ].

---

**15.** In *Bonner v. City of Prichard* the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**16.** *Loretto's* finding, that a landowner's option not to rent property in order to avoid the cable access requirement was not a voluntary choice eliminating the "required acquiescence" element of a physical occupation, contradicts *General Telephone*. *Loretto*, 458 U.S. at 439 & n. 17, 102

S.Ct. at 3178 & n. 17 ("[This] broad 'use-dependency' argument proves too much.... The right of a property owner to exclude a stranger's physical occupation of his land cannot be so easily manipulated."). *See also Florida Power*, 480 U.S. at 252–53, 107 S.Ct. at 1112. Contrary to the conclusions of *General Telephone*, the "voluntary choice" to enter into a business which would subsequently subject the property owner to a mandatory access provision does not forfeit the owner's right to just compensation. *See Loretto*, 458 U.S. at 439 n. 17, 102 S.Ct at 3178 n. 17.

Defendants' and Intervenors' arguments are further weakened by strong indications in the Eleventh Circuit and Supreme Court that a mandatory access provision imposed on utilities, like the one at issue here, may amount to a *per se* taking under the Fifth Amendment. *Florida Power*, 772 F.2d 1537, *rev'd*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282. As discussed previously, the Eleventh Circuit held that the Pole Attachment Act, as originally enacted in 1978, amounted to a taking but was then reversed by the Supreme Court, finding that the element of "required acquiescence" was absent from the FCC's order. *Id.* However, the Eleventh Circuit's opinion is still instructive in several ways. First, by finding that the order constituted a taking, the court impliedly stated that a utility, even with its partly public, partly private status, holds the right to exclude as one of its sticks in the bundle of property rights. *See* 772 F.2d at 1543–44. Second, the court found that the physical invasion of the utility's poles satisfied the element of permanency as set forth in *Loretto*. *Id.* at 1544. Third, the absence of any discussion whatsoever of *General Telephone*, in either the Eleventh Circuit or the Supreme Court, would tend to support this Court's abandonment of it today.

Although the Supreme Court reversed the Eleventh Circuit, it did so based on one significant factor which distinguished it from *Loretto* —in *Florida Power* the element of "required acquiescence" was entirely absent from the statute. *Florida Power*, 480 U.S. 245, 252 & n. 6, 107 S.Ct. 1107, 1112 & n. 6 ("The language of the [1978] Act provides no explicit authority to the FCC to require pole access for cable operators, and the legislative history strongly suggests that Congress intended no such authorization.") (citing S.REP. No. 95–580, 95th Cong. 2nd Sess. at 16, (1977), *reprinted in* 1978 U.S.C.C.A.N. at 124 (The Act "does not vest within a CATV system operator a right to access to a utility pole, nor does the bill, as reported, require a power company to dedicate a portion of its pole plant to communications use.")). *See also* Sidak & Spulber, *Deregulatory Takings*, 71 N.Y.U.L.Rev. at 946–54. Unlike the landlord in *Loretto*, by contracting with the cable company to provide access, the utility voluntarily relinquished its exclusion rights, effec-tively inviting the cable company to occupy space on its poles. *Florida Power*, 480 U.S. at 252–53, 107 S.Ct. at 1112 ("[I]t is the invitation, not the [regulated] rent, that makes the difference."). However, in making this distinction, the Court signaled that it might have reached a different result had a mandatory access provision been implement-ed by the FCC. *Id.* at 245 n. 6, 107 S.Ct. at 1112 n. 6 ("We do not decide today what the application of Loretto ... would be if the FCC in a future case required utilities, over objection, to enter into ... pole attachment agreements.").

■ That day is upon the Court, and it now finds that the *per se* rule of *Loretto* is applicable to the instant case. A utility as defined by the Act is required to provide any cable television system or telecommunica-tions carrier with nondiscriminatory access to its poles and conduits. 47 U.S.C. §§ 224(a)(1) & (f). Such access is a perma-nent physical occupation of property, effec-tively divesting a utility of its right to ex-clude. Furthermore, because the element of "required acquiescence" is present in the nondiscriminatory provision, distinguishing the case at bar from *Florida Power*, the permanent occupation of a utility's poles and conduits amounts to a *per se* taking of prop-erty under *Loretto* and the Fifth Amend-ment.

**2. WHETHER THE FCC, AN ADMIN-ISTRATIVE AGENCY, HAS THE POWER TO DETERMINE JUST COMPENSATION FOR PURPOSES OF THE FIFTH AMENDMENT TAKINGS CLAUSE**

■ The Takings Clause of the Fifth Amendment "does not prohibit the taking of private property, but instead places a condi-tion on the exercise of that power." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987) It is not designed "to limit the governmental in-terference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.* at 315, 107 S.Ct. at 2385–86 (emphasis in original). Essential to any

Fifth Amendment argument then is that a taking of property, whether the result of the *per se* rule promulgated in *Loretto* or an *ad hoc* factual inquiry pursuant to *Penn Central*, does not violate the Constitution so long as it provides for just compensation.

■ In the case at bar, the Utilities argue that the Pole Attachment Act unconstitutionally prescribes a binding rule for an administrative determination of just compensation under the Fifth Amendment (doc. 40:14). This legislative delegation to the FCC, Plaintiffs assert, usurps their right to an initial judicial ascertainment of compensation (*id.*). To the contrary, Defendants contend that just compensation does not require judicial review at the outset, but rather must only be subject to some degree of judicial review after the FCC's initial determination (docs.47:24).[17]

Plaintiffs rely on the Eleventh Circuit's interpretation of *Monongahela Navigation Co. v. United States*, which held that a decision concerning the just compensation owed an owner whose property is taken is within the province of judicial and not legislative determination. 148 U.S. 312, 327, 13 S.Ct. 622, 626–27; 37 L.Ed. 463 (1893), *cited in, Florida Power Co. v. FCC*, 772 F.2d 1537 (11th Cir.1985), *rev'd on other grounds*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987). In *Florida Power*, the Eleventh Circuit *sua sponte* addressed the fundamental question of whether the FCC has the power to determine just compensation for purposes of the Just Compensation Clause. 772 F.2d at 1544. Looking primarily to *Monongahela*, a case decided over a century ago, the court found that the "determination of just compensation ... was constitutionally inadequate

... because it was made by an administrative agency at the behest of Congress rather than by judicial inquiry as required by law." *Florida Power*, 772 F.2d at 1546.[18]

In deciding the fundamental issue of which branch of government may make a just compensation determination, the Eleventh Circuit acknowledged the overriding concerns held by the *Monongahela* Court of the potential conflict of powers that might arise from a legislative determination of compensation due as a result of a legislatively ordered taking. As the Utilities have so concisely stated, "a fox cannot be charged with guarding the hen house" (doc. 40:15). While not as succinct as Plaintiffs, the *Monongahela* Court recognized the same concern:

> The right of the legislature ... to apply the property of the citizen to the public use, and then to constitute itself the judge in its own case, to determine what is the 'just compensation' it ought to pay therefor, or how much benefit it has conferred upon the citizen by thus taking his property without his consent, or to extinguish any part of such 'compensation' by prospective conjectural advantage, or in any manner to interfere with the just powers and province of courts and juries in administrating right and justice cannot for a moment be admitted or tolerated under our constitution.

*Monongahela*, 148 U.S. at 327–28, 13 S.Ct. at 627 (citation omitted), *quoted in, Florida Power*, 772 F.2d at 1545.

This concern is indeed a valid one. However, what the courts in *Monongahela* and *Florida Power* did not address is that judicial review of a legislative determination affords the same separation-of-powers protections

---

17. To some extent Intervenors make the same argument (doc. 55:18), but they also maintain that remedies under the Tucker Act, 28 U.S.C. § 1491, sufficiently provide for a means of just compensation as constitutionally required (*id.* at 14). This argument, the propriety of which the Court questions where the Utilities are making a *facial* challenge to the Act, need not be addressed today as the Court now finds the Act does indeed provide just compensation exclusive of remedies available pursuant to Tucker Act. Intervenors also argue that this case is not ripe for resolution, (doc. 55:16); however, as the Utilities make only a facial challenge to the Act's constitutionality, exhaustion of remedies here becomes moot for the purposes of this motion.

18. As discussed *supra* Part II(B)(i), the Supreme Court reversed the Eleventh Circuit on the initial takings question, thus rendering review of the compensation issue moot. *Florida Power*, 480 U.S. at 254 n. 8, 107 S.Ct. at 1113 n. 8 ("Our disposition of the takings question makes it unnecessary to review on the merits the Court of Appeals' holding that Congress may not establish standards under which the initial determination of compensation will be made by an administrative authority subject to final judicial review."). Although no part of the Eleventh Circuit's decision in *Florida Power* is binding, the rationale underlying its compensation analysis is relevant to this Court's examination of the Act.

that would otherwise be guarded by an initial judicial assessment of compensation. It is this concept of judicial review which lies at the heart of the separation-of-powers and is in fact exactly what this Court is engaged in today. The Utilities have come before this Court seeking review of the constitutionality of a Congressional enactment, one which "determined" that telecommunications carriers shall have nondiscriminatory access to utilities' poles and conduits. 47 U.S.C. § 224(f). The Court's judicial review of that "determination" serves to ensure that Congress has not overstepped its authority. Judicial review of a just compensation determination guards against similar abuses.

So, while the courts in *Monongahela* and the Eleventh Circuit correctly reasoned that "a decision concerning the just compensation owed one whose property is taken is the province of judicial—not legislative—determination," they did not reach the question of whether this requirement may be satisfied by the availability of subsequent judicial review. *See Wisconsin Cent. Ltd. v. Public Serv. Comm'n*, 95 F.3d 1359, 1369 (7th Cir.1996) (citing *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186–94, 105 S.Ct. 3108,. 3116–20, 87 L.Ed.2d 126 (1985)).[19] While not directly addressing the issue presented before this Court today, the Supreme Court in *Williamson County* implicitly recognized that an assessment of just compensation does not re-quire judicial determination. 473 U.S. at 194–95, 105 S.Ct. at 3120–21. In that case, the Court envisioned both federal and state agencies as appropriate entities to make just compensation determinations:

> [A]ll that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking. If the government has provided an adequate process for obtaining compensation, and if resort to that process yields

just compensation, then the property owner has no claim against the Government for a taking.... Similarly, if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been.denied just compensation. *Id.* at 194–95,105 S.Ct. at 3120–21 (citations and internal quotation marks omitted).

The Court's conclusions in *Williamson County* only serve to reinforce this Court's reasoning above. The Supreme Court held that the taking claim at issue in that case was not ripe for review because the respondent had not already sought compensation through procedures already provided for by the state. *Id.* The Court found that a property owner does not suffer a violation of the Just Compensation Clause until he has un-successfully attempted to obtain compensation through state procedures. *Id.* Only then may the owner resort to judicial review of the denial of just compensation. *Id.* at 195, 105 S.Ct. at 3121 ("[B]ecause the Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking, the State's action here is not 'complete' until the State fails to provide adequate compensation for the taking."). Resort to a judicial remedy was appropriate only after first seeking compensation pursuant to state created procedures.

Furthermore, the Court now finds that an FCC determination subject to judicial review is not only constitutionally sound, but is the more practical approach to a just compensation decision made pursuant to the Pole Attachment Act. The valuation of usable and unusable space on a utility's poles, conduits, and ducts involves multiple geographic, technical, and safety considerations which constantly change according to a variety of ele-

---

19. *Wisconsin Central* involved a state statute which required railroads to allow public utilities to construct facilities within a railroad's right-of-way under certain conditions. *Wisconsin Cent. Ltd. v. Public Serv. Comm'n*, 95 F.3d 1359 (7th Cir.1996). The court found that the statute, or-dering a physical invasion of property, amounted to a taking under the Fifth Amendment, but then held that plaintiffs had not exhausted available state remedies for just compensation which was a prerequisite to filing suit in an Article II court. *Id.* at 1368–69. In challenging this ripeness is-sue, plaintiffs argued that state remedies were inadequate as they did not provide for an initial judicial determination of just compensation. *Id.* Rejecting this contention, the court found that judicial review was sufficient to satisfy the Just Compensation Clause under the Fifth Amend-ment. *Id.* at 1369.

**1398**

ments. *See* REPORT AND ORDER OF THE FCC, *Implementation of Section 703(e) of the Telecommunications Act of 1996,* FCC 98–20 (adopted Feb. 6, 1998). Maximizing resources and always cognizant to the concerns of judicial economy, the Court realizes that these multifactor inquiries are best left to the entities that confront them on a daily basis. The FCC is far more capable than the courts to make such determinations in an efficient and knowledgeable manner. However, although the FCC remains in the decisive spotlight, the court is forever in its shadow, and it is this lingering possibility of judicial review which ensures compliance with the just compensation guarantees of the Fifth Amendment.

"The Fifth Amendment does not require a judicial determination of just compensation in the first instance on each occasion of a taking of private property." *Wisconsin Central Ltd.,* 95 F.3d at 1369. As such, the compensation provisions of the Pole Attachment Act do not offend the constitutional protections of the Just Compensation Clause where a permanent physical occupation of property amounts to a taking. Because the Act effects a taking for which just compensation is provided, Plaintiffs' motion for summary judgment must be **DENIED.** Defendants' motion for summary judgment is **GRANTED.** Additionally, as Intervenors seek the same remedy and make several arguments which overlap those of Defendants, their motion for summary judgment is also **GRANTED** for the foregoing reasons.

### III. SUMMARY

The Court's ruling in this matter may be summarized as follows, and **IT IS HEREBY ORDERED:**

1. Plaintiffs' motion for summary judgment (doc. 38) is **DENIED.**

2. Defendants' and Intervenors' motions for summary judgment (docs.46, 54) are **GRANTED.**

3. Summary judgment is hereby entered in favor of Defendants and Intervenors. Plaintiffs take nothing by this action, and Defendants and Intervenors go without day.