[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 14, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-14763

_____

FCC  Docket No. PA 00-00003

ALABAMA POWER COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents,

ALABAMA CABLE TELECOMUNICATIONS
ASSOCIATION,
COMCAST CABLEVISION OF DOTHAN, INC,
AMERICAN ELECTRIC POWER SERVICE
CORPORATION,

Intervenors,

_____

No. 00-15068

_____

FCC Docket No. PA-00-003

GULF POWER COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents,

AMERICAN ELECTRIC POWER SERVICE CORPORATION,
COMMONWEALTH EDISON COMPANY,
DUKE ENERGY CORPORATION,

Intervenors.

_____

No. 01-13058

_____

FCC  Docket No. 01-00181-FCC

ALABAMA POWER COMPANY and
GULF POWER COMPANY,

Petitioners,

versus

FEDERAL COMMUNICATIONS
COMMISSION and the UNITED STATES,

Respondents,

ALABAMA CABLE TELECOMMUNICATIONS ASSOCIATION,
COMCAST CABLEVISION OF DOTHAN, INC., et al.,

2

and

AMERICAN ELECTRIC POWER SERVICE CORPORATION,
COMMONWEALTH EDISON COMPANY, ET AL.,

Intervenors.

_____

Petitions for Review of Orders
of the Federal Communications Commission
_____

**(November 14, 2002)**

Before TJOFLAT, BARKETT and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

As part of the Telecommunications Act of 1996, Congress amended the Pole

Attachment Act of 1978 to give cable television companies the right to acquire

space on the utility poles of power companies at rates established by a formula (the

"Cable Rate"[1]) promulgated by the Federal Communications Commission ("FCC"

or "Commission"). See 47 U.S.C. § 224. Under the regulatory scheme, if the

parties are unable to agree on the price, the cable company can seek relief in the

---

[1] The mathematical expression of the Commission's rules, found in 47 C.F.R. § 1.1409(e)(1), is as follows:

*Maximum Rate* = (*Space Occupied by Attachment* ÷ *Total Usable Space*) × *Net Cost of Bare Pole* × *Carrying Charge Rate*

FCC's Cable Bureau.  In this case, the Cable Bureau, and on review, the FCC, rejected the price demanded by Alabama Power ("APCo") for a cable television company's mandatory right of access to its utility poles, and it ordered the parties to negotiate a price within the parameters of the Cable Rate.  See In the Matter of Ala. Cable Telecomm. Ass'n et al. v. Ala. Power Co., 16 FCC Rcd. 12,209 (2001).  APCo, Gulf Power Company ("Gulf Power"), and several intervenors now ask us to declare that the rate imposed by the FCC does not  provide just compensation and therefore violates the Takings Clause of the Fifth Amendment.  In essence, the petitioners are using this case as a vehicle to mount a challenge to the rate methodology set forth in 47 U.S.C. § 224(d)[2] and the FCC's implementation of the rate methodology in 47 C.F.R. §§ 1.1401 et seq.  We hold that based on the particular facts of this case, the petitioners have failed to meet their burden of proof. We therefore deny the petitions for review.

The factual context of this case is difficult to comprehend without an understanding of the economic and legislative climate existing prior to the 1996 Act, as well as the history of Fifth Amendment litigation in the pole attachment

---

[2] The rate for cable television attachments is prescribed in 47 U.S.C. § 224(d), which states: "[A] rate is just and reasonable if it assures a utility of recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of usable space which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way."

context. Part I of this opinion provides this necessary background. Part II takes a

detour from the primary focus of this case by addressing the standing and

exhaustion issues presented. The heart of the case is found in part III, where we

find that there has been no violation of the Takings Clause. Finally, part IV

addresses arguments concerning the administrative process, such as whether the

FCC acted in a way that is arbitrary and capricious, or whether it failed to provide

the litigants with due process.

I.

Certain firms have historically been considered to be natural

monopolies–bottleneck facilities that arise due to network effects[3] and economies of

scale.[4] Such firms have historically included electric utilities, local telephone

---

[3]Network effects often enhance the monopoly position of firms that operate in industries where a large number of common customers is especially advantageous. See Stuart M. Benjamin, Douglas G. Lichtman, and Howard A. Shelanski, Telecommunications Law and Policy 616 (2002) ("All else equal, wouldn't you have a strong incentive to select the phone company that had the largest number of customers with whom you might want to converse? Once you join, can you see how this same phenomenon would increase the pressure on, say, your friends and family – which in turn would put pressure on their friends and family – to join the same phone network, thus increasing any monopoly tendency already at play in the market?"). The cost of competing with an incumbent firm in a network industry may well be insurmountable. As the Supreme Court recently explained: "A newcomer could not compete with the incumbent carrier to provide local service without coming close to replicating the incumbent's entire existing network, the most costly and difficult part of which would be laying down the 'last mile' of feeder wire, the local loop, to thousands (or millions) of terminal points in individual houses and businesses." Verizon Communications Inc. v. FCC, __ U.S. __, 122 S. Ct. 1446, 1662, 152 L. Ed. 2d 701 (2001).

[4]Economies of scale typically arise when long-run average total cost declines as output increases. See Benjamin et al., Telecommunications Law and Policy 376 (2001). This attribute

5

companies,[5] and oil pipelines.  <u>See generally</u> Richard D. Cudahy, <u>Whither Deregulation: A Look at the Portents</u>, Ann. Surv. Am. L. 155 (2001).  Firms in other markets frequently need access to these bottlenecks in order to compete.  The "essential facilities" doctrine in antitrust law has often provided the legal remedy for such problems.  <u>See, e.g.</u>, <u>Otter Tail Power Co. v. United States</u>, 410 U.S. 366, 93 S. Ct. 1022, 35 L. Ed. 2d 359 (1973); <u>see generally</u> Phillip E. Areeda & Herbert Hovenkamp, 3A <u>Antitrust Law</u> ¶ 772 (1996).  Over the last several years, however, Congress has sought to codify forced-access regulations rather than resorting to judge-made principles of antitrust law.  The most noteworthy effort in this vein was the Telecommunications Act of 1996, 47 U.S.C. §§ 151 <u>et. seq</u>.  In that monumental legislation, Congress sought to break the hold of incumbent telephone monopolies and pave the way for local competition.  As an intermediate step toward the end-game of facilities-based competition, Congress allowed competitive local exchange carriers (CLECs) to gain forced access to the unbundled network elements (UNEs)

---

is common in industries where the initial fixed cost is very large and variable costs are comparatively slight.  <u>Id.</u>  The result is that "eventually there will be only a single company, because until a company serves the whole market it will have an incentive to keep expanding in order to lower its average costs."  <u>Omega Satellite Products Co. v. Indianapolis</u>, 694 F.2d 119, 126 (7th Cir. 1982) (Posner, J.).

[5]A central premise of the 1996 Act is that local exchange carriers (LECs) may not be natural monopolies after all.  <u>See</u> Benjamin et al., <u>Telecommunications Law and Policy</u> 715 (2001) ("[P]olicymakers and entrepreneurs were ready to question the underlying assumption that local service should – or at least as a practical matter would – be provided by state-sanctioned monopolists.").

of incumbent local exchange carriers (ILEC) at regulated rates.[6] <u>See</u> 46 U.S.C. § 251(c)(3).

In another provision of the Act, Congress turned its attention away from the relationship between CLECs and ILECs and focused on the relationship between cable television companies and electric power companies. Power companies have something that cable companies need: pole networks. Concerned about the monopoly prices power companies could extract from the cable companies, Congress allowed cable companies to force their way onto utility poles at regulated rates. This regime was not entirely born in 1996, however. The only novel part of the 1996 Act was *forced* access. Pole attachments have in fact been regulated since 1978, and our story must therefore turn to an earlier date.

Since the dawn of the cable television industry, cable companies have attached their cables to utility poles owned by telephone companies and, more frequently, power companies. In the view of Congress, the costs of erecting an entirely new set of poles would have created an insurmountable burden on cable companies. As the owner of these "essential" facilities, the power companies had superior bargaining power, which spurred Congress to intervene in 1978. The Pole

---

[6]The rate formula promulgated by the FCC (known as "TELRIC") has been the source of several statutory and constitutional challenges. <u>See, e.g.</u>, <u>Verizon Communications Inc. v. FCC</u>, __ U.S. __, 122 S. Ct. 1446, 1662, 152 L. Ed. 2d 701 (2001).

Attachment of Act of 1978 gave the FCC authority to "regulate rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable" in any state that does not already have such regulations in place. 47 U.S.C. § 224(b)(1). The Act further provided that the minimum reasonable rate is equal to "the additional costs of providing pole attachments," while the maximum reasonable rate is to be calculated "by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way." 47 U.S.C. § 224(d)(1).[7] Based on these guidelines, the FCC promulgated regulations that focused on the upper end of this range. Importantly, the 1978 Act did not *force* power companies to yield access; the regulated rates applied only if (and when) voluntary agreements were entered into. These regulations led to a constitutional challenge under the theory that, under Loretto v. Teleprompter-Manhattan CATV Corp., 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982), they worked a *per se* physical taking without providing just

---

[7]This rate formula, unchanged since 1978, was restated more clearly by the Supreme Court: "The minimum measure is thus equivalent to the marginal cost of attachments, while the statutory maximum measure is determined by the fully allocated cost of the construction and operation of the pole to which cable is attached." See FCC v. Florida Power Corp., 480 U.S. 245, 253, 107 S. Ct. 1107, 1113, 94 L. Ed. 2d 282 (1987).

8

compensation . This court partially agreed and held that the FCC's Order effected a taking of Florida Power's property. Florida Power Corp. v. FCC, 772 F.2d 1537, 1544 (11th Cir. 1985). We went on to hold, however, that the FCC, as an administrative agency rather than an Article III court, did not have the power to determine what is just compensation for purposes of the Fifth Amendment Takings Clause. Id. The Supreme Court reversed, holding that Loretto did not apply because the Act did not *require* power companies to give access to cable companies. See FCC v. Florida Power Corp., 480 U.S. 245, 251-53, 107 S. Ct. 1107, 1111-12, 94 L. Ed. 2d 282 (1987). The Court asserted, "[I]t is the invitation, not the rent, that makes [Loretto] different. The line which separates these cases from Loretto is the unambiguous distinction between a commercial lessee and an interloper with a government license." Id. at 243, 107 S. Ct. at 1112. Therefore, the *per se* rule of physical takings did not apply, and the Court upheld the rate regulation under the "traditional" Fifth Amendment standard that applies to rate regulations: "So long as the rates set are not confiscatory, the Fifth Amendment does not bar their imposition." Id. (citing St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 53, 56 S. Ct. 720, 726, 80 L. Ed. 1033 (1936)). In sum, the Supreme Court found that there was no Fifth Amendment violation, and therefore did not address whether the initial determination of just compensation could be

9

made by an administrative agency subject to judicial review. Florida Power, 480 U.S. at 254, 107 S. Ct. at 1113 n.8.

Fast forward to 1996. As part of the sweeping changes Congress brought about through the Telecommunications Act of 1996, Congress amended the 1978 Act by giving cable companies a right of forced attachment. That is, power companies could not decline offers to attach at regulated rates, save for the statutory exceptions of insufficient capacity or some safety, reliability, or other engineering problem. See 47 U.S.C. § 224(f)(2).[8] This change to a forced-access regime was perhaps spurred by new laws, consistent with the 1996 Act's vision of competition in all sectors of the data distribution business, that gave large power companies freedom to enter the telecommunications business rather than remain quarantined to the electricity business. Pub. L. No. 104-104, § 103 (1996). Perhaps fearing that electricity companies would now have a perverse incentive to deny potential rivals the pole attachments they need, Congress made access mandatory. See Southern Company v. FCC, 293 F.3d 1338, 1341-42 (11th Cir. 2002) ("Cable companies were fearful that utilities' prospective entry into the telecommunications market

---

[8]A panel of this court recently used this statutory exception as the basis for vacating an FCC rule which forced power companies to enlarge pole capacity at the request (and expense) of attaching cable and telecommunications companies. See Southern Company v. FCC, 293 F.3d 1338, 1346-47 (11th Cir. 2002). The panel could not reconcile the no-capacity excuse allowed under the statute with the forced build-out rules required under the FCC's regulations, and thus held the regulations to be *ultra vires*.

would endanger their pole attachments, as utilities would be unwilling to rent space on their poles to competing entities. Congress elected to address both of these matters in the 1996 Telecommunications Act."). In all other respects, however, the regulatory regime remained the same. Because of this statutory change – ever important in light of the Supreme Court's distinction of <u>Loretto</u> from <u>Florida Power</u> – power companies renewed their Takings Clause challenge.

In one case, the power companies took aim at the statute itself, alleging that it was facially unconstitutional because it took property without just compensation. The district court held that the amendment effected a *per se* taking, but granted summary judgment in favor of the FCC. <u>See</u> <u>Gulf Power Co. v. United States</u>, 998 F. Supp. 1386 (N.D. Fla. 1998). In conclusory fashion, the court found the compensation to be "just," <u>id.</u> at 1386, and also held that the availability of judicial review by an Article III court rendered the initial determination of just compensation by the agency constitutionally permissible, notwithstanding our earlier holding in <u>Florida Power</u>, 772 F.2d at 1544. We affirmed for different reasons, agreeing with the district court that the Act works a *per se* taking under <u>Loretto</u>, but that the Act provides an adequate process for obtaining judicial

11

review.[9]  Gulf Power Co. v. United States, 187 F.3d 1324 (11th Cir. 1999) ("Gulf

Power I").  However, we rejected the facial challenge, holding that the parties

failed to show that no set of circumstances exist under which the Act would be

valid.[10]

In another case, the power companies filed a petition for review in this court,

seeking reversal of an FCC Order, In re Implementation of Section 703(e) of the

Telecommunications Act of 1996, 13 FCC Rcd. 6777 (1999), that devised a formula

for computing the attachment rent.  See Gulf Power Co. v. FCC, 208 F.3d 1263

(11th Cir. 2000) ("Gulf Power II").  We held that (1) the FCC lacked jurisdiction to

regulate pole attachments to the extent that the attaching cable operators also

offered Internet service, (2) the 1996 Act authorized a taking as previously

---

[9]Like the district court, we held that the availability of judicial review in the court of appeals made the process for determining "just compensation" constitutionally permissible.  We went on to enumerate "at least five means at its disposal to gather the information needed to determine just compensation." Gulf Power v. United States, 187 F.3d 1324, 1334-35 (11th Cir. 1999).  A court of appeals could: (1) rely on the evidentiary submissions in the record of the FCC proceeding; (2) remand the case and direct the FCC to supplement the record pursuant to 28 U.S.C. § 2347(c); (3) transfer the case to a district court for full hearing pursuant to 28 U.S.C. § 2347(b)(3); (4) appoint a special master to hold hearings pursuant to Fed. R. App. P. 48; (5) or fashion any other "appropriate modes of procedure" to gather evidence it needs pursuant to the All Writs Act, 28 U.S.C. § 1651.

[10]Our holding on this point is somewhat confusing in that it seemingly held both that (a) the challengers failed to meet their burden of proof to show that in all situations the rate formula would inevitably be unconstitutional and (b) the takings claim was not ripe for review.  This need not concern us here, and in any event there is an obvious affinity between the ripeness doctrine and the standard for facial challenges: both doctrines frequently require the challenger to bring a concrete, as-applied challenge.

determined by Gulf Power I, and (3) the just compensation claim failed because the parties did not establish that there was no set of circumstances in which the FCC's rate regulation (like the general statutory rate scheme challenged in Gulf Power I) would be valid. The first holding was subsequently reversed by the Supreme Court in Nat'l Cable & Telecomm. Ass'n v. Gulf Power Co., 534 U.S. 327, 122 S. Ct. 782, 151 L. Ed. 2d 794 (2002).

Forced to bring a challenge in an as-applied context, APCo seized its opportunity in June 2000. APCo sent several letters to cable companies stating that it would terminate attachment agreements unless the cable companies agreed to higher rates.[11] Specifically, APCo demanded an annual rate of $38.81 per pole rather than the current $7.47. Various cable companies[12] sought relief by filing a complaint against APCo in the FCC's Cable Bureau, which ultimately found for the cable companies. The Bureau ordered APCo to reinstate the old $7.47 fee until a new agreement within the parameters of the Cable Rate could be reached. Ala. Cable Telecom. Ass'n v. Ala. Power Co., 15 FCC Rcd. 173,461 (2000).

---

[11]The pole attachment agreement between APCo and AT&T Cable Services was typical of the agreements worked out by cable and power companies. Section 31 of the agreement provided for an initial three year term (which had expired by the time APCo sought termination), followed by "continuation" unless either party provided the other with 90 days notice of cancellation.

[12]The initial complaint was filed by the Alabama Cable Telecommunications Association and Comcast Cablevision of Dothan, Inc.

Meanwhile, a similar proceeding was initiated against Gulf Power by the Florida Cable Telecommunications Association and three cable Internet service providers, although that case languished in the Bureau and has yet to come to a resolution. Both APCo and Gulf Power filed petitions for review of the adjudication against APCo in this court, nos. 00-14763 and 00-15068, and they simultaneously sought review by the full Commission.

Since the initial filing of these petitions, two important decisions have been rendered. First is the Supreme Court's decision in <u>National Cable</u>. In that case, the Court reversed our first holding in <u>Gulf Power II</u> (regarding the FCC's jurisdiction) and thereby answered the jurisdictional arguments raised in this case. Thus, any contention that the FCC lacks jurisdiction to regulate the attachment rates of cable companies that also offer Internet services must fail. The second decision is the full Commission's Order affirming the Cable Bureau in the APCo proceeding. <u>See</u> <u>In the Matter of Ala. Cable Telecomm. Ass'n et al. v. Ala. Power Co.</u>, 16 FCC Rcd. 12,209 (2001). That decision rendered moot the FCC's argument that we ought not reach the merits of this case because the parties failed to exhaust their administrative remedies.[13] The Order also becomes the focus of any challenge

---

[13]That is, the Order eliminated any exhaustion problem that would have precluded us from reaching the merits at all. As we shall explain, however, the Order did not eliminate all exhaustion concerns.

under the Administrative Procedure Act, 15 U.S.C. § 706.[14]

In short, the as-applied context of this litigation, combined with the recent decisions of the FCC and Supreme Court, eliminate any threshold concerns that would otherwise preclude us from reaching the merits, such as ripeness, exhaustion (and hence the jurisdiction of this court), and the jurisdiction of the FCC. Moreover, our decisions in Gulf Power I and Gulf Power II establish that the 1996 Act effects at taking, and our decision in Gulf Power I establishes that an initial determination of just compensation by the FCC is constitutionally permissible so long as there is judicial review in an Article III court.[15]  The primary issue in this case, then, is a narrow one: whether the rate authorized by the FCC provides APCo with just compensation.

## II.

## A.

Before we address the merits, two threshold issues warrant our attention. First, the Communications Act of 1934 requires an application for review to the full

---

[14]"The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  15 U.S.C. § 706(2)(A).

[15]The petitioners renew their argument that regardless of the availability of judicial review, an administrative agency cannot determine just compensation in the first instance.  "The law of this circuit," however, "is 'emphatic' that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision."  See Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997).

Commission as a prerequisite to judicial review of decisions made under delegated authority.  See 47 U.S.C. § 155(c)(7).[16]  The mere act of filing an application alone does not satisfy the jurisdictional prerequisite.  The petitioners must give the Commission an opportunity to issue a final decision; otherwise, the statutory prerequisite would be rendered useless.  The rest of section 47 U.S.C. § 155(c)(7) confirms this common sense observation by mandating that the time limit for filing a petition for review in the court of appeals must be computed "from the date upon which public notice is given of orders disposing of all applications for review filed in any case."  Id.  That is, the Commission must in some way act on the application for review before a party may petition a court of appeals for review.  See Richman Bros. Records Inc. v. FCC, 124 F.3d 1302 (D.C. Cir. 1997).  In this case, both Gulf Power and APCo sought to bypass the full Commission by petitioning this court for review of the Cable Bureau's decision.  Both petitions were therefore incurably premature – at least until the Commission finally reviewed APCo's petition.  Accordingly, both of the initial petitions, nos. 00-14763 and 00-15068, are dismissed for failure to exhaust.

---

[16]The statute states, "The filing of an application for review shall be a condition precedent to judicial review of any order, decision, report, or an action made or taken pursuant to a delegation under paragraph (1) of this subsection."  "Paragraph (1)," referred to in the statutory text, empowers the Commission to delegate its functions to an "employee board or individual employee" and other entities.  See 47 U.S.C. § 155(c)(1).  This provision is the statutory basis for the Cable Bureau's authority to issue the first order in this case.

B.

The petition for review filed by Gulf Power is also defective because petitions for review may be filed only by parties to an agency proceeding. The Communications Act cross-references to the Hobbes Act, and so the latter governs the procedure for judicial review of FCC orders. See 47 U.S.C. § 402 ("Any proceeding to enjoin, set aside, annul, or suspend any order of the commission under this chapter . . . shall be brought as provided by and in the manner prescribed in [the Hobbs Act,] chapter 158 of Title 28."). That statute, in turn, provides that "[a]ny party aggrieved by the final order may . . . file a petition to review the order in the court of appeals where venue lies." 28 U.S.C. § 2344. A "party aggrieved" is one who participated in the agency proceeding. See, e.g., Erie-Niagara Rail Steering Committee v. Surface Trans. Bd., 167 F.3d 111, 111-12 (2d cir. 1999); See also In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 799 F.2d 317, 334 (7th Cir. 1986) ("The statute limits review to petitions filed by parties, and that is that."). Another statute confirms this conclusion. Under 28 U.S.C. § 2348, only parties to the agency proceeding can intervene as of right, while intervention by a nonparty is discretionary. This statutory condition would be defeated if the nonparty could file its own petition for review as a matter of right. Accordingly, Gulf Power's initial petition for review in case, no. 00-15068, must also be

17

dismissed for lack of standing. The Commission's final order does not affect this conclusion.[17] This leaves us only with APCo's petition for review of the Order by the full Commission, no. 01-13058 – a petition joined by various intervenors but not Gulf Power.

## III.

## A.

The petitioners contend that the statute and regulations fail to provide just compensation in this case. Their argument stems from three critical observations. First, the Cable Rate fails to allocate to the attaching cable companies a pro rata share of the unusable portion of the pole. The unusable portion – the part of the pole that is below ground or is otherwise unavailable for attachment – is a capital expenditure that benefits the cable companies no less than APCo.[18] The unusable portion constitutes a vast majority of the pole and provides ground clearance that creates the requisite elevated corridor that is necessary for all attachments. Therefore, the petitioners argue, such expenditures should be allocated to the attaching entities equally. Second, the petitioners argue that the Cable Rate

---

[17]Gulf Power is interested in the outcome of this case only because of its potential effect as a precedent for its own pending case. We note that Gulf Power has not moved to intervene. We will therefore treat it as *amicus curiae* in the APCo petition, no. 00-13058.

[18]The regulated rate that telecommunications companies must pay, by contrast, includes the unusable portion of the pole. See 47 U.S.C. § 224(3).

inappropriately uses backwards-looking "historical" costs rather than fair market value or replacement cost. Since pole-related expenditures are largely a function of labor costs, the present "cost" of a network of poles is much greater than it was when the network was first erected. Third, the Cable Rate does not allow the recovery of various expenditures that are properly attributable to pole attachments. Once these costs are taken into account, together with an appropriate adjustment that allocates part of the unusable portion of the pole to cable companies and a further adjustment that utilizes fair market value or replacement (rather than historical) cost,[19] the "just" rate would be an annual rent of over $47 per pole. Because $47 is a "conservative" estimate, and since petitioners seek only $38.81 per pole, it is argued that the drastically less rate of $7.47 fails to provide just compensation.

We review constitutional challenges to agency orders *de novo*. Gulf Power II, 208 F.3d 1263, 1271; Rural Tel. Coalition v. FCC, 838 F.2d 1307, 1313 (D.C. Cir. 1988). At first blush, the power companies appear to have a solid argument. The FCC inappropriately focused on ratemaking cases such as Duquense Light Co. v. Barach, 488 U.S. 299, 307, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989). Cases like

---

[19]In the proceeding before the Cable Bureau, expert witnesses were used to generate assessments of "value" based upon market value, income capitalization, and replacement cost methodologies.

Duquense Light stand for the proposition that rates can be regulated so long as they are not so "unjust" as to be confiscatory, and within this range the regulatory agency has broad discretion.  Id. at 307, 109 S. Ct. at 616.  When a physical taking is at issue, however, a different analytical hat must worn.  *See* 5 Nichols on Eminent Domain § 18.06 [2], at 18-46 ("[T]raditional methods of valuation used in rate-making cases are not necessarily valid when eminent domain value is at issue."); Consolidated Gas Co. of Fla. v. City Gas Co. of Fla., 912 F.2d 1262, 1314 n.52 & 1319 (11th Cir. 1990), vacated, 499 U.S. 915 (1991) (Tjoflat, C.J., dissenting) ("Because the company acts under compulsion . . . rather than voluntarily submitting to regulation as in the ratemaking cases, the court should apply a more rigorous standard for just compensation than the relatively broad 'zone of reasonableness' standard developed under Hope.").  The Supreme Court made this analytical distinction clear in FCC v. Florida Power Corp., 480 U.S. 245, 107 S. Ct. 1107, 94 L. Ed. 2d 282 (1987), when the Court reversed this court for applying the traditional Loretto analysis rather than the "not confiscatory" standard. Id. at 253, 107 S. Ct. at 1113-14.  As we have stated, this case *does*, in fact, trigger the Loretto analysis because of the element of compulsion in the 1996 Act.

In physical takings cases, the property owner generally must receive the

"full monetary equivalent of the property taken." United States v. Reynolds, 397 U.S. 14, 16, 90 S. Ct. 803, 805, 25 L. Ed. 2d 12 (1970). See also United States v. Miller, 317 U.S. 369, 373, 63 S. Ct. 276, 279, 87 L. Ed. 336 (1943) (just compensation requires "the full and perfect equivalent in money of the property taken."). The Supreme Court has remained steadfast in its resistance to a rigid rule for determining just compensation. See, e.g., United States v. Commodities Trading Corp., 339 U.S. 121, 123, 70 S. Ct. 547, 549, 94 L. Ed. 707 (1950). Typically, fair market value is used. Id. Fair market value is established by determining "what a willing buyer would pay in cash to a willing seller" at the time of the taking. Miller, 317 U.S. at 374, 63 S. Ct. at 280. There is not an active, unregulated market for the use of "elevated communications corridors," however, and so an alternative to fair market value must be used. Cf. General Motors v. United States, 140 F.2d 873, 875 (7th Cir. 1994) (discussing use of replacement cost and income capitalization approaches). The appropriate alternative, whatever that may be, rarely countenances the use of historical cost, as several Supreme Court cases make clear. See Commodities Trading Corp., 339 U.S. at 130, 70 S. Ct. at 553; United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 403, 70 S. Ct. 217, 221-22, 94 L. Ed. 195 (1949). Therefore, APCo argues that any of its substitute methods – the "sales comparison" approach, the

21

"replacement cost" approach, or the "income capitalization" approach – should be used. Any of these, it argues, yield a much higher rate than the FCC presently allows. When a constitutionally acceptable cost methodology is combined with a more appropriate inclusion of costs (such as unusable pole space and various capital expenditures), the "full monetary equivalent of the property taken" exceeds the $38.81 rate APCo seeks. While we might ordinarily be sympathetic to this argument,[20] APCo's case is complicated by one known fact, one unknown fact, and one legal principle.

The known fact is that the Cable Rate requires the attaching cable company to pay for any "make-ready" costs and all other marginal costs (such as maintenance costs and the opportunity cost of capital devoted to make-ready and maintenance costs), in addition to some portion of the fully embedded cost. See In the Matter of Ala. Cable Telecomm. Ass'n et al. v. Ala. Power Co., 16 FCC Rcd.

---

[20]Or maybe not. Arguably, this "as-applied" challenge flies in the face of our conclusion in Gulf Power I and Gulf Power II that the power companies failed to prove that there is no circumstance in which the rate would be constitutionally acceptable. That conclusion would seem to foreclose any argument based on the *methodology* of the formula – the crux of petitioners' argument in this case. The panel, however, may well have had in mind the general judicial aversion to facial challenges to rate orders, and it perhaps did not mean to preclude future challenges to the rate methodology in an as-applied context. See Verizon Communications v. FCC, __ U.S. __, 122 S. Ct. 1646, 1679-80, 152 L. Ed. 2d 701 (2001) ("[T]he general rule is that any question about the constitutionality of ratesetting is raised by rates, not methods.").

12,209, ¶ 69 n.154 (2001).  Indeed, such costs were paid in the present case.[21]

The legal principle is that in takings law, just compensation is determined by the loss to the person whose property is taken.  United States v. Causby, 328 U.S. 256, 261, 66 S. Ct. 1062, 1065-66, 90 L. Ed. 1206  (1946).  Put differently, "[t]he question is, What has the owner lost?  not, What has the taker gained?"  United States v. Virginia Elec. & Power Co., 365 U.S. 624, 635, 81 S. Ct. 784, 792, 5 L. Ed. 2d 838 (1961) (citation omitted).  This takings principle is a specific application of the general principle of the law of remedies: an aggrieved party should be put in as good a position as he was in before the wrong, but not better.  See generally Dan B. Dobbs, 1 Law of Remedies 281 (1993).  This legal principle, together with the fact that much more than marginal cost is paid under the Cable Rate, leads us to ask the following question: does marginal cost provide just compensation in this case?

This question exposes the unique nature of this case.  Typically, the subject of a government condemnation proceeding is ordinary property, such as land.  In such a case, the "value" of the thing taken is congruent with the loss to the owner, and there is therefore little tension between the legal propositions in Virginia Electric (loss to the owner, not gain to the taker) and Reynolds (full monetary

---

[21]APCo received more than a million dollars in make-ready payments from cable company attachers.

equivalent of the property taken). This is because most property is rivalrous – its possession by one party results in a gain that precisely corresponds to the loss endured by the other party. In this case, however, the property that has been taken – space on a pole – may well lack this congruence. It may be, for practical purposes, *nonrivalrous*. This means that use by one entity does not necessarily diminish the use and enjoyment of others. A common example of a nonrivalrous good is national defense.

Suppose, for example, that a power company must, for its own "core" electric distribution activities, establish a network of poles that reaches one million feet into the sky. Further suppose that there is only one cable company in any one market that desires to attach to the power company's poles. Finally, suppose that the government forces the power company to let the cable company attach to its pole network. What level of compensation is just? So long as the marginal cost of the attachment is paid, the power company incurs no lost opportunity or any other burden. That is, the cable company's use does not foreclose any other use. The pole space is, for practical purposes, nonrivalrous.

To this point APCo responds that the lost sale to the cable company – its opportunity cost – has also been taken. We think, however, that it is irrelevant whether the government keeps the condemned property for itself or appropriates it

to another entity. That is, if the government ran its own monopoly cable company, it would not make sense for the power companies to say, "Even though we are not out any more money than we were before the taking, we are missing out on the opportunity to sell to the government at what we deem the 'full market price' of this pole space." Cf. United States v. Cors, 337 U.S. 325, 333, 69 S. Ct. 1086, 1091, 93 L. Ed. 1392 (1949) ("The special value to the condemner as distinguished from others who may or may not possess the power to condemn has long been excluded as an element of market value."). It should not make a difference if the government chooses to allocate the condemned property to private companies.

In some cases, then, marginal cost will be sufficient to compensate the pole owner. A similar conclusion was reached in Metropolitan Transp. Auth. v. ICC, 792 F.2d 287 (2d Cir. 1986). In that case, Amtrak was given the power to force its way onto the tracks of other railroad companies. The ICC had authority to decide the compensation Amtrak would pay, with the constraint that such compensation was to be limited to "incremental costs." The Second Circuit concluded:

> [A]ssuming arguendo that there has been a taking, compensation is
> adequate since MTA, in obtaining avoidable costs, will receive what it
> would have had but for the taking. In other words, the owner, there
> the lessee of the railroad facilities, will be put into the same position

monetarily as it would have occupied if the property had not been taken, and this is precisely the guiding principle of what is just compensation. . . . If the Fifth Amendment required such a sharing [of the overhead costs of ownership, then the petitioners] would be put in a better position by Amtrak's appearance on the scene. True, Amtrak benefits. But if we know one immutable principle in the law of just compensation, it is that the value to the taker is not to be considered, only loss to the owner is to be valued.[22]

Id. at 297.

Metropolitan Transportation involved something close to a nonrivalrous good. Allowing traffic from one railroad rarely means that another railroad is precluded from traveling on the same line unless, of course, the line is already crowded. The possibility of crowding is perhaps more likely in the context of pole space, however, and if crowded, the pole space becomes rivalrous. Indeed, Congress contemplated a scenario in which poles would reach full capacity when it created a statutory exception to the forced-attachment regime. 47 U.S.C. § 224(f)(2). When a pole is full and another entity wants to attach, the government

---

[22]Notably, the court did not take the flawed analytical step of focusing on the track owner's lost opportunity to charge Amtrak "market" rates.

26

taking forecloses an opportunity to sell space to another bidding firm – a missed opportunity that does not exist in the nonrivalrous scenario. By forcing the power company to rent space that could be occupied by another firm (or put to use by the power company itself), the analogy to land becomes more appropriate. In the "full capacity" situation, it is the zero-sum nature of pole space, like land, that is key. This leads us to the important unknown fact: nowhere in the record did APCo allege that APCo's network of poles is currently crowded. It therefore had no claim. See United States v. John J. Felin & Co., 334 U.S. 624, 641, 68 S. Ct. 1238, 1246, 92 L. Ed. 1614 (1948) (holding that the burden of proving loss, as well as the amount of any loss, is upon the party claiming to have experienced a taking).

In short, before a power company can seek compensation above marginal cost, it must show with regard to each pole that (1) the pole is at full capacity and (2) either (a) another buyer of the space is waiting in the wings or (b) the power company is able to put the space to a higher-valued use with its own operations. Without such proof, any implementation of the Cable Rate (which provides for much more than marginal cost) necessarily provides just compensation. While this analysis may create what appears to be an anomaly – a power company whose poles are not "full" can charge only the regulated rate (so long as that rate is above marginal cost), but a power company whose poles are, in fact, full can seek just

27

compensation – this result is in accordance with the economic reality that there is no "lost opportunity" foreclosed by the government unless the two factors are present.[23]

## IV.

## A.

APCo contends that regardless of how we ultimately rule on the merits, the FCC's decision is "arbitrary and capricious" and therefore must be set aside under 5 U.S.C. § 706.  The policy decisions of agencies must be set aside if they are not the product of reasoned decisionmaking.  Courts are deferential to agency decisions and will not upset them merely because they disagree with the policy choice of the agency. See  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 823-24, 28 L. Ed. 2d 136 (1971).  In short, the court "must not . . . substitute [its] judgment for that of the agency . . . but rather

---

[23]Since marginal cost provides just compensation so long as these factors are absent, it is irrelevant that the Telecom Rate provided in 47 U.S.C. § 224(e) yields a higher rate for telecommunications attachments than the Cable Rate provides for cable attachments.  The FCC reached a perfectly logical conclusion when it observed:

> Congress' decision to choose a slightly different rate methodology, more suited in its opinion to telecommunications service providers, does not call into question the constitutionality of the cable rate formula . . . because both formulas provide just compensation under the Fifth Amendment . . . .  Congress used its legislative discretion in determining that cable and telecommunications attachers should pay different rates.

In the Matter of Ala. Cable Telecomm. Ass'n, 16 FCC Rcd. 12,209, ¶ 49.

determine whether there was a rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S. Ct. 239, 245-46, 9 L. Ed. 2d 207 (1962).

We are unconvinced that the FCC's decision was arbitrary and capricious. APCo argues that the FCC's misguided references to Duquense Light and other ratemaking cases, combined with its refusal to engage in detailed consideration of APCo's evidence on the just compensation issue, evinces unreasoned decisionmaking. The FCC did, however, note that reimbursement of marginal cost was tantamount to just compensation in this case. See In the Matter of Ala. Cable Telecomm. Ass'n et al. v. Ala. Power Co., 16 FCC Rcd. 12,209 ¶ 52 (2001). Therefore, it was not obliged to engage in detailed analysis of expert testimony concerning the value proxies proffered by the petitioners' experts, which were irrelevant given the sufficiency of marginal cost. To be sure, the Cable Bureau and the full Commission might have been advised to inquire about the level of capacity presently on APCo's poles. But we can hardly fault the Commission for ignoring an issue that APCo never raised.

Finally, we note that APCo does not contend that the FCC decision was arbitrary and capricious in its policy determination; its concern is only with the FCC's constitutional analysis. Accordingly, we do not address the policy-based

29

defenses raised by the FCC.[24]

B.

APCo asserts that the Commission's pole attachment complaint proceeding is defective because "if and when" they are ultimately successful in their claim that they are entitled to more than the statutory rate, "there may not be any process that will compensate APCo retroactively," because the FCC "apparently lacks the statutory authority to order a cable company to retroactively pay a charge higher than the statutory maximum." This argument posits a mere hypothetical. APCo has not demonstrated that in this case the Commission's procedures failed to provide it with adequate compensation, and so resolution of its claim must await another day. Moreover, this court explained in Gulf Power I that if a court were to find an FCC order to be insufficient, Section 224 permits the court to direct

> the FCC to issue a rate order providing that a utility receive the just compensation rate from the date it was first required to provide access under the mandatory access provision [and thereby] ensure a utility receives just compensation both prospectively and in the period prior to the court's determination of the just compensation rate.

---

[24]We do not reach, for example, the question as to whether a hypothetical determination by the FCC to set the rate at marginal cost would be an "arbitrary and capricious" one, even if marginal cost would provide just compensation for Fifth Amendment purposes.

Gulf Power I, 187 F.3d at 1335.

C.

APCo also contends that the FCC's complaint process violated its Fifth Amendment due process rights because "pole complaints normally are to be adjudicated on the basis of the pleadings, without the opportunity for a hearing." Like the first procedural claim, this claim fails because it is based on a general observation rather than a real-life injury. The Commission's rules state that "[t]he Commission may decide each complaint upon the filings and information before it . . . or may, in its discretion, order evidentiary procedures upon any issues it finds to have been raised by the filings." 47 C.F.R. § 1.1411. APCo must therefore identify a material question of fact that warrants a hearing. But its dispute is only over the *methodology* that should be used to calculate the level of just compensation – an legal issue that hardly warrants an evidentiary hearing since no material facts are disputed. See Mathews v. Eldridge, 424 U.S. 319, 321, 96 S. Ct. 893, 896, 47 L. Ed. 2d 18 (1976) (requiring that before a court concludes that there has been a due process violation, there must be a private interest affected). For example, if APCo and the cable companies were to later disagree about whether a pole network is operating at full capacity, the FCC may commit a due process violation if it were to adopt the cable companies' position without an evidentiary

31

hearing.  That day, however, has not yet arrived.

## V.

It is well settled that if the government commits a taking, it is under an obligation to put the aggrieved party in the position it was in before the taking occurred (and no better).  In unique cases such as this one, marginal cost meets this test – unless, of course, the aggrieved party proves lost opportunity by showing (1) full capacity and (2) a higher valued use.  APCo never alleged these facts.  Therefore, its challenges based on the Fifth Amendment and the Administrative Procedure Act must fail, and its petition for review is denied.

SO ORDERED.